IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N D I C T M E N T** |
| | ) | |
| Plaintiff, | ) | **1 : 19   CR   148** |
| | ) | |
| v. | ) | CASE NO. |
| | ) | |
| JAMES ALLEN CLARK, | ) | Title 18, United States Code, |
| ERIC LOUIE HOGAN, | ) | Sections 286, 287, 1031, 1343, |
| KENNETH ALLEN LATHAM, | ) | 1346, 1349 and 2. |
| JAMES KEVIN ALFORD, | ) | |
| HARVEY DANIELS, JR., | ) | |
| | ) | JUDGE GWIN |
| Defendants. | ) | |

## GENERAL ALLEGATIONS

At all times material to this Indictment:

*Defendants*

1.    Defendant JAMES ALLEN CLARK ("CLARK") was a United States Citizen,

and a resident of Florida.

2.    Defendant ERIC LOUIE HOGAN ("HOGAN") was a United States citizen, and a

resident of Georgia.

3.    Defendant KENNETH ALLEN LATHAM ("LATHAM") was a United States

citizen, a resident of Georgia, employed as a civilian engineering technician for the United States

Navy assigned to the Marine Corps Logistical Base in Albany, Georgia, and a public official. As an engineering technician, LATHAM was responsible for, among other things, the day-to-day oversight of contractors working on Department of the Navy funded contracts, approving estimated cost invoices and certifying that work on contracts was completed in order to approve payments to contractors. LATHAM owed a fiduciary duty to the United States, the Department of Defense, the United States Navy, the United States Marine Corps, and United States citizens and taxpayers to perform the duties and responsibilities of his office in their best interests and to provide them with his honest services.

4.      Defendant JAMES KEVIN ALFORD ("ALFORD") was a United States citizen, and a resident of Kentucky.

5.      Defendant HARVEY DANIELS, JR. ("DANIELS") was a United States citizen, and a resident of Florida.

*Relevant Companies and Individuals*

6.      CLARK was the vice-chairman, vice-president and registered agent of Enola Contracting Services, Inc., ("Enola"). The company is further discussed below in Paragraphs 37-40.

7.      HOGAN was the owner of P and E Construction, LLC ("P&E"). The company is further discussed below in Paragraphs 41-44.

8.      ALFORD was the owner of K&S Constructors, Inc. ("K&S"). The company is further discussed below in Paragraphs 45-47.

9.      On or about October 4, 2006, the U.S. Department of Veterans Affairs ("VA") received HOGAN's claim requesting adjudication of a service-related disability. On or about May 11, 2007, the VA adjudicated HOGAN as a Service Disabled Veteran ("SDV").

10. DANIELS was the owner of HDJ Security, Inc. ("HDJ"), which was registered to conduct business in the State of Florida. The company is further discussed below in Paragraphs 51-53.

11. Kent Reynolds ("Reynolds"), named but not charged herein, was the owner of Arrow Construction Group, LLC ("Arrow"), which was registered to conduct business in the State of Florida. The company is further discussed below in Paragraphs 48-50.

12. Jennifer Dillard ("Dillard"), named but not charged herein, was the spouse of Reynolds and the vice president of Arrow.

13. Cooperating Witness 1 ("CW-1") was a licensed insurance agent.

14. Surety Company 1 was an insurance company that was in the business of issuing surety bonds to construction companies contracting with the government. CW-1 was an authorized agent of Surety Company 1.

*Government Agencies*

15. The National Aeronautics and Space Administration ("NASA") was an agency of the United States responsible for the civilian space program, as well as aeronautics and aerospace research. The Glenn Research Center and Plum Brook Station were both NASA facilities located in the Northern District of Ohio dedicated to the research and development of innovative technologies to advance NASA's aeronautics and space exploration missions.

16. The Department of the Navy ("DoN") was a branch of the United States Armed Forces, a component of the Department of Defense ("DOD"). The United States Navy ("USN") and the United States Marine Corps ("USMC") were military services of the United States operating within the DoN. The Naval Facilities Engineering Command ("NAVFAC") was the DoN command responsible for planning, building and maintenance of DoN facilities and was a component of the USN.

17.     The USMC was an expeditionary force, responsible for protecting the interests of the United States and the lives of its citizens through combat operations, humanitarian relief efforts, and other missions.  Among the USMC's purposes were to serve as a rapid-response force prepared to swiftly and aggressively respond to crises.  The 82nd United States Congress mandated that the USMC "be the most ready when the nation is generally least ready." Accordingly, the USMC was often referred to as "the first to fight" among the Armed Forces. There were approximately 200,000 active duty Marines and 40,000 reserve Marines.

18.     The Marine Corps Logistics Base ("MCLB") in Albany, Georgia, was a DoN facility and one of only two USMC installations within the United States that supported the USMC Logistics Command.  MCLB-Albany's principal mission was to rebuild and repair ground combat and combat-support equipment, and to support military installations on the United States' eastern coast.  MCLB-Albany played a pivotal role in the nation's defense, as much of the military equipment used by the USMC in Afghanistan, Iraq, and other parts of the world was refurbished there.  MCLB-Albany employed approximately 3,000 civilians and approximately 400 Marines were stationed there.  Contracts for construction concerning MCLB-Albany fell under the supervision and management of NAVFAC.

19.     The U.S. Department of Veterans Affairs ("VA") was the agency of the United States charged with providing veterans and their families with services and benefits.  In furtherance of that mission, VA administered a wide range of financial benefit programs.

20.     The United States Small Business Administration ("SBA") was created to aid, counsel, assist and protect the interests of small business concerns.  The SBA administered a number of government contracting programs including, but not limited to, the 8(a) Business Development Program, and established the Service-Disabled Veteran-Owned Small Business

Program. Both programs directed government contracts to eligible small businesses while limiting competition from larger, ineligible businesses.

21.     The Defense Finance and Accounting Service ("DFAS") was the agency of the DOD responsible for payments to DOD and military services, including USN and USMC vendors and contractors. DFAS payments for MCLB-Albany contracts for construction managed by NAVFAC were processed and paid by DFAS facilities in Cleveland, Ohio ("DFAS-Cleveland") in the Northern District of Ohio.

## Background

### *Federal Contracting Programs*

22.     To accomplish their missions as established by Congress, federal departments and agencies, to include NASA, VA, USN and USMC, contracted with businesses to furnish goods and services. Congress directed that a substantial portion of these contracts be awarded to small businesses. SBA worked with Federal agencies to award at least 23 percent of all prime government contracts to small businesses, with specific statutory goals, among others, for small disadvantaged businesses, including service-disabled veteran-owned small businesses.

23.     To meet the statutory requirement that a certain percentage of prime contracts be awarded to small businesses, federal departments and agencies used "sole-source" and "set-aside" awards to reserve certain contracts exclusively for small businesses, the awarding of such contracts usually being done through negotiation with the small business. A "sole-source" award was directed to a specific small business and a "set-aside" award was limited to a particular category of businesses that met the relevant SBA program participation criteria.

24.     Small businesses seeking sole-source and set-aside contracts under the programs were required to self-certify their eligibility to be awarded such contracts. Representations and certifications concerning eligibility to participate were made through on-line services, to include

the Central Contractor Registry ("CCR"), the Online Representations and Certifications

Application ("ORCA"), the System for Award Management ("SAM"), and for service-disabled

veteran-owned small businesses seeking contracts from the VA, through the VA's Center for

Veterans Enterprises ("CVE").

*8(a) Business Development Program*

25.     The 8(a) Business Development Program ("8(a) Program") was a business

assistance program for small disadvantaged businesses administered by the SBA. Participation in

the 8(a) Program was divided into two phases over nine years: a four-year developmental stage

followed by a five-year transition stage after which a business graduated from the program and

was no longer eligible for further 8(a) Program awards.  8(a) Program participants could obtain

sole-source contracts and submit offers for contracts that were set-aside for 8(a) Program

participants.

26.     To have been eligible to participate in the 8(a) Program, businesses must have met

a number of criteria, including being at least 51 percent unconditionally owned and controlled by

socially and economically disadvantaged individuals as defined by SBA regulations.

27.     A business seeking to participate in the 8(a) Program must submit an application

to SBA containing representations and certifications concerning eligibility.  SBA determined

whether the listed owner was a disadvantaged person (socially and economically), whether the

business was properly formed, and whether the owner was otherwise eligible.  The applicant

must provide information to show the business had potential for success, such as lists of earlier

contracts and information concerning capitalization and financial resources. The applicant must

also report any affiliations, such as indemnification agreements, because those affiliations could

show that someone other than the disadvantaged person was in control of the business.  At all

time, SBA depended on the truthfulness of applicants and depended on applicants to notify SBA if there were any changes that would affect eligibility to participate in the 8(a) Program.

*Service-Disabled Veteran Owned Small Business*

28.     Among the programs established by Congress to assist service-disabled veterans ("SDVs") was the procurement program for Service-Disabled Veteran Owned Small Businesses ("SDVOSBs"). The SDVOSB program was designed to assist SDVs obtain government contracts by "setting aside" certain contracts for small businesses owned and controlled by SDVs. This procurement program restricted competition for certain government contracts to SDVOSBs, and awarded set-aside or sole source contracts for SDVOSBs where certain criteria were met.

29.     To be eligible for the SDVOSB program, the veteran and the business must have met the following criteria: (1) the SDV must have a service-connected disability as determined by the VA or U.S. Department of Defense; (2) the SDVOSB must be small under the North American Industry Classification System ("NAICS") code assigned to the procurement; (3) the SDV must unconditionally own 51 percent of the SDVOSB; (4) the SDV must control the management and daily operations of the SDVOSB; and (5) the SDV must hold the highest officer position in the SDVOSB.

30.     Federal regulations required that one or more SDVs controlled the management and daily business operations of the concern. Control by one or more SDVs meant that both long-term decision-making and the day-to-day management and administration of the business operations were conducted by one or more SDVs.

31.     The VA Center for Veterans Enterprise, now known as the Center for Verification and Evaluation ("CVE"), was a program office of the VA's Office of Small and Disadvantaged Business Utilization. CVE's primary role was to provide verification to Veteran-Owned Small

Businesses ("VOSBs") and SDVOSBs seeking to do business with the VA. CVE evaluated and verified the ownership and control of VOSBs and SDVOSBs in accordance with program requirements. The VA relied on CVE determinations of VOSB and SDVOSB eligibility, which were based on the applicant's truthfulness. Firms approved as eligible for verified VOSB and SDVOSB status were registered in CVE's Vendor Information Pages ("VIP") database, accessible at vetbiz.gov, which was used for VA set-aside contracts for VOSBs and SDVOSBs.

32.     Contractors bidding on SDVOSB set-aside contracts were required to self-certify that they were an SDVOSB via an electronic submittal in SAM annually.

33.     In certain instances, an SDVOSB firm could enter into a joint venture agreement with one or more other Small Business Concerns ("SBC") for the purpose of performing an SDVOSB contract provided the joint venture met the following requirements: (1) the SDVOSB notified the Government in its initial contract bid of the existence of the joint venture; (2) each SBC was small under the contract's North American Industry Classification System code; (3) the SDVOSB managed the joint venture; (4) the SDVOSB performed the applicable percentage of work; and (5) at least 51 percent of the net profits earned were distributed to the SDVOSB.

34.     From on or about August 30, 2005, through on or about March 13, 2011, SBA regulations limited JVs to the submission of no more than three contract bids over a two year period, based on the submission of the first contract bid.

*Surety Bond Requirements on Federal Projects*

35.     Any Federal construction contract valued at $150,000 or more required a surety bond when bidding or as a condition of contract award. A surety bond ensured contract completion in the event of contractor default. The contractor obtained a surety bond from a surety company. If the contractor defaulted, the surety company was obligated to find another

contractor to complete the contract or compensate the project owner for the financial loss incurred.

36.    There were four types of surety bonds:

    a.  A Bid Bond ensured that the bidder on a contract would enter into the contract and furnish the required payment and performance bonds if awarded the contract;

    b.  A Payment Bond ensured suppliers and subcontractors were paid for work performed under the contract;

    c.  A Performance Bond ensured the contract was completed in accordance with the terms and conditions of the contract; and

    d.  An Ancillary Bond ensured requirements integral to the contract, but not directly performance-related, were performed.

**Corporate Entities**

*Enola Contracting Services*

37.    From on or about March 19, 1997, until on or about September 25, 2015, Enola was incorporated and registered to conduct business in the State of Florida with a listed address in Chipley, Florida. CLARK was listed as the vice-chairman of Enola's board of directors and vice-president. On or about November 7, 2011, Enola registered to conduct business in the State of Kentucky.

38.    From on or about December 28, 2000, until on or about December 28, 2009, Enola was enrolled in the 8(a) Program and was eligible to receive certain set-aside and sole-source government contracts, and form joint ventures and team with other companies to bid on government contracts.

39.     On or about December 28, 2009, Enola graduated from the 8(a) Program and was no longer eligible to compete for 8(a) Program set-aside or sole-source contracts.

40.     CLARK was neither a veteran nor an SDV, and Enola was neither CVE verified nor eligible to compete for SDVOSB set-aside or sole-source contracts.

*P and E Construction*

41.     From on or about October 22, 2007, through on or about August 24, 2017, P&E was organized and registered to conduct business in the State of Georgia with a listed address in Bonaire, Georgia. HOGAN was listed as the registered agent, chief executive officer, chief financial officer, and secretary.

42.     At all times material to this Indictment, P&E, through HOGAN and CLARK, made false statements, misrepresentations and omissions of facts, as outlined in Paragraphs 60-71 below, and obtained CVE verification as a SDVOSB.

43.     On or about March 5, 2013, January 16, 2014, January 12, 2015, and December 15, 2015, HOGAN certified in SAM that P&E was an Service-Disabled Veteran-Owned Small Business Concern meaning that, among other matters: (1) the business was at least 51 percent unconditionally owned by an SDV; and (2) an SDV controlled the management and daily business operations of the business.

44.     From on or about February 1, 2009, until on or about January 30, 2015, "P and E Construction & Enola Contracting JV" ("P&E and Enola JV") was registered in federal procurement databases as a joint venture.  HOGAN was listed as president and CLARK as vice-president of the joint venture.

*K&S Constructors*

45.     From on or about February 15, 2013, through on or about September 12, 2015, K&S was incorporated and registered to conduct business in Kentucky with a listed principal

address in Auburn, Kentucky, and a mailing address in Bowling Green, Kentucky. ALFORD was listed as incorporator, registered agent, owner, and president.

46.     On or about March 25, 2013, K&S filed a certificate of assumed name in Kentucky to do business as Enola Construction Services, Inc. ("K&S d/b/a Enola").

47.     ALFORD was neither a veteran nor an SDV, and K&S was neither CVE verified nor self-certified in SAM as an SDVOSB.

*Arrow Construction Group*

48.     Arrow was organized in and around March 2006 in the State of Alabama. On or about June 20, 2007, it was registered to conduct business in the State of Florida with a listed address in Marianna, Florida. Reynolds was listed as the registered agent and managing member of Arrow.

49.     From on or about February 4, 2008, until on or about February 4, 2017, Arrow was enrolled in the 8(a) program and was eligible to receive set-aside and sole-source government contracts, and form joint ventures and team with other companies to bid on government contracts.

50.     Reynolds was the "Disadvantaged Owner" of Arrow.

*HDJ Security*

51.     From on or about July 9, 2003, through on or about September 25, 2015, HDJ was registered to conduct business in the State of Florida with a listed address in Marianna, Florida. DANIELS was initially listed as the Vice-President and the Secretary-Treasurer, and later records listed DANIELS as the "Officer/Director" of HDJ.

52.     Beginning on or about September 25, 2009, HDJ was enrolled in the 8(a) program and was eligible, until in or around September 2018, to receive set-aside and sole-source

government contracts, and form joint ventures and team with other companies to bid on government contracts.

53.    DANIELS self-identified as the President of HDJ to the SBA. DANIELS also claimed to own 100 percent of HDJ and to be socially disadvantaged.

## Bonding and Pass-Through Schemes

### *Pass-Through Companies*

54.    Pass-through companies violated the intent and purpose of the SDVOSB and 8(a) programs. Pass-through schemes typically consisted of a program eligible company being used by an ineligible company to qualify for and obtain SDVOSB or 8(a) program set-aside or sole source contracts.  The program-eligible company then "passed" the work and the majority of the benefits of the contract to the ineligible company.  The involvement of the ineligible company, and the true nature of its relationship with the program-eligible company, was not disclosed to the government agencies responsible for oversight of the SDVOSB or 8(a) programs and participants or the agencies or departments awarding or managing the contracts. The two companies often had overlapping employees. This type of scheme often involved at least two purportedly different companies.

### *Back-Bonding Pass-Through Companies*

55.    Bonding was a material factor in determining a company's eligibility to participate in the 8(a) and SDVOSB programs.  "Back-bonding," however was prohibited under the 8(a) program regulations, and a material factor in CVE's determination of eligibility to participate in the SDVOSB program.  Back-bonding schemes typically involved a pass-through company that cannot obtain the necessary bonding to bid on a government contract. Therefore, the pass-through company used an ineligible company's established bonding capacity with an insurance company to obtain the required bonds.  Sometimes, the pass-through company passed

the work and the majority of the benefits of the contract to the ineligible company in exchange for a fee. Back-bonding agreements, either verbal or in writing, were not shared with the government agencies responsible for oversight of the SDVOSB and 8(a) programs and participants or the agencies or departments awarding or managing the contracts. Thus, the government was not aware of the ineligible company's role or involvement, nor was the government aware that the purportedly qualified pass-through company could not supply a sufficient bond to ensure contract performance. This type of scheme would typically involve at least two purportedly different companies.

## THE SCHEMES TO DEFRAUD

56.     CLARK, HOGAN, ALFORD, DANIELS, LATHAM and others engaged in criminal schemes designed to deprive the United States of its right to the honest services of its employees through bribes and kickbacks, and to submit false claims and defraud the United States by obtaining government contracts set-aside for qualified companies to which they were otherwise ineligible to obtain by fraudulently using proxy and pass-through companies.

*I.     Scheme to Defraud the USN of its Right to the Honest Services of its Employees Through Bribes and Kickbacks*

57.     The first scheme to defraud involved HOGAN, CLARK and LATHAM defrauding the USN of the right to the honest services of LATHAM through a series of bribes and kickbacks provided to him by HOGAN and CLARK, in return for LATHAM using his official position in the USN to benefit HOGAN, CLARK, their businesses (P&E and Enola) and others, both as requested and as the opportunities arose.

58.     CLARK and HOGAN began a business relationship in and around 2008 when they were introduced to one another by LATHAM who later served as an engineering technician for the USN.  CLARK and HOGAN offered or provided LATHAM things of value, to include

cash, meals, a hunting trip, a fence, and an all-terrain vehicle, to which LATHAM was not entitled, in return for LATHAM using his official position as a USN civilian engineering technician to benefit HOGAN, CLARK, P&E and Enola, and others, both as requested and as opportunities arose. Among the benefits LATHAM provided to HOGAN and CLARK in return for the stream of benefits they provided LATHAM were LATHAM's assistance in finding and securing government contracts, approval of invoices for payments to pass-through companies used by HOGAN and CLARK to obtain SDVOSB and 8(a) set-aside contracts for which their respective companies were not otherwise eligible, and in concealing CLARK's and HOGAN's pass-through schemes involving back-bonding of companies otherwise incapable of obtaining sufficient bonding capacity on their own.

II.    Scheme to Defraud the VA and CVE Regarding HOGAN's and P&E's Eligibility for the SDVOSB Program

59.    The second scheme to defraud involved defrauding the VA and CVE by falsely and fraudulently representing that P&E and HOGAN qualified for the SDVOSB program despite CLARK's involvement in providing bonding for and his equity ownership in P&E.

60.    On or about April 23, 2009, HOGAN, CLARK, Enola, P&E, the P&E and Enola JV, and others executed a general indemnity agreement with Surety Company 1.

61.    On or about September 9, 2009, HOGAN e-mailed CLARK and discussed a bid that he proposed to submit for a government contract and wrote "Just one thing bothers me … We are not supposed to do more than three JV agreements ([whether] we get the bid or not) and this is our 5th … If they keep a record of this somewhere we are [] caught [but] [i]t may be time for us to come to some kind of arrangement so P and E can bid on its own …." On or about September 10, 2009, CLARK replied to HOGAN that "[Surety Company 1] approved stand alone bonding for P&E with Enola [a]s 49% owner.[] You [HOGAN] need to execute a sale of

14

stock to enola [t]hat I can show [Surety Company 1]. . . ." CLARK stated that he would ask [Surety Company 1] to bond P&E up to $10 million.

62.    On or about September 23, 2009, a VA contracting official e-mailed HOGAN and rescinded consideration of a bid submitted by the P&E and Enola JV because the JV had already submitted three bids in a two-year period. On or about the same date, HOGAN e-mailed CLARK and wrote "Allen, I don't know how he knew that we bid on three jobs this year unless he called [the Dublin, Georgia, VA Medical Center] and found out. At least this will not be a problem in the future . . . ."

63.    On or about July 30, 2012, the VA received a protest, which challenged P&E's status as a SDVOSB.

64.    On or about September 11, 2012, the VA sustained the protest and determined that P&E did not meet the status requirements of a SDVOSB because P&E failed to satisfy the control requirements imposed on SDVOSB participants in that: (1) HOGAN failed to satisfy the control requirement due to his full-time, outside employment with Enola; (2) HOGAN's control was compromised by his need to remain in the employ of Enola, a company that owned a minority stake in P&E; and (3) P&E relied on Enola for "critical bonding support."

65.    On or about September 12, 2012, in response to the VA's determination described in the preceding Paragraph, HOGAN and CLARK took the following actions:

      a.    HOGAN revised his resume indicating his only current employment position was as owner of P&E.

      b.    HOGAN falsely altered P&E's fiscal year 2011 year-end meeting minutes to reflect that P&E received bonding on its own merits.

c.  CLARK and HOGAN sent and caused to be sent to the VA a letter on Enola letterhead, which stated that HOGAN had not been employed by Enola since December 2009, although previous versions of HOGAN's resume indicated he was a project manager for Enola through in or around 2012.

d.  CLARK e-mailed CW-1 and HOGAN with a draft letter for CW-1 to provide the VA stating that CW-1 would bond P&E without involvement from CLARK or Enola.

66.  On or about September 13, 2012, HOGAN e-mailed CLARK, and quoted the regulations concerning the SDVOSB program's control requirements that specifically noted that non-veterans or entities may be found to control or have the power to control the SDVOSB if the non-veteran or entity had an equity interest in the SDVOSB and provided "critical financial or bonding support," and wrote, "Allen, I don't see how I can get out of this." On or about that same date, CLARK responded to HOGAN's e-mail and wrote, "I will transfer back my stock to you on paper and we will do an off-line agreement with [Surety Company 1]."

67.  On or about September 14, 2012, CLARK e-mailed a VA contracting officer to inform the official that CLARK transferred all of his shares in P&E back to HOGAN, when in truth and fact, as he then well knew, this statement was false, because CLARK did not inform the VA contracting officer that he had an "off-line agreement" and continued partnership with HOGAN, as referenced above in Paragraphs 65 through 66.

68.  In and around November 2012, HOGAN applied to the VA for verification of P&E as a SDVOSB. In his application, HOGAN failed to disclose to the VA that he and CLARK remained partners.

69.     On or about December 10, 2012, based upon HOGAN's and CLARK's false and fraudulent misrepresentations described above in Paragraph 65, CVE recommended P&E be reinstated in the SDVOSB program.

70.     On or about January 4, 2013, CVE e-mailed HOGAN a determination letter to inform HOGAN that P&E's SDVOSB status was verified and that P&E was eligible to participate in the SDVOSB program. On or about that same date, HOGAN forwarded the CVE e-mail to CLARK, and ALFORD, and wrote, "We are back in business!"

71.     On or about March 4, 2013, CLARK and HOGAN exchanged e-mails that confirmed that CLARK and Enola continued to back-bond P&E, in which CLARK stated "I am not going to be allowed by [Surety Company 1] to continue assuming the risk of bonding P&E without showing and actually realizing some profit," and HOGAN replied, "I understand…if you want to stop fronting bond I will move to locate my own bonding."

III.    *Scheme to Defraud the USN, SBA, VA, CVE, and NASA Regarding 8(a) and SDVOSB Program Contracts*

72.     CLARK, HOGAN, ALFORD, DANIELS and others also defrauded the United States by obtaining SDVOSB and 8(a) Program set-aside contracts by using purportedly qualified SDVOSBs or 8(a) Program eligible companies as proxies to bid and obtain set-aside contracts. The proxies would then pass-through the majority of the benefits and obligations of the contract to ineligible companies in exchange for bonding capacity because the proxy companies could not obtain the required bonds on their own.

A.    USN Contract for Marine Corp Logistics Base (Test Track), Albany, Georgia – 2011-2014

73.     On September 26, 2011, ("NAVFAC") contract N69450-11-C-2269 was awarded to Arrow, with an initial value of approximately $2,827,176.41, to "Design/Build Test Track Repairs & Safety Upgrades" ("Test Track contract") at MCLB-Albany. The Test Track contract

was awarded to Arrow under a sole source 8(a) set aside procurement solicitation, which could only be awarded to a bona fide 8(a) Program small business concern and required that the prime contractor perform at least 15% of the total labor on the contract with its own employees. The final contract value was approximately $2,853,111.

74.     On or about September 26, 2011, Dillard, vice-president of Arrow signed the contract.  CLARK, Reynolds and Dillard failed to disclose to SBA the fact that CLARK and Enola used their bonding capacity to back-bond Arrow.  CLARK, Reynolds and Dillard also failed to disclose to NAVFAC that the majority of the Test Track contract was being sub-contracted to Enola to conceal that Arrow was acting as a pass-through for Enola on the contract.

75.     On or about July 31, 2012, CLARK caused the transfer of 49 percent of the ownership of Arrow to CLARK and Reynolds's relinquishment of 51 percent of his voting rights in Arrow to CLARK giving CLARK total management control of Arrow.

76.     On or about November 13, 2012, CLARK sent and caused to be sent an approximately $587,175.83 invoice for payment to NAVFAC from Arrow. On or about December 3, 2012, CLARK directed Dillard to issue a check to Enola for approximately $537,290 out of the approximately $587,290 Arrow received from DFAS-Cleveland in the Northern District of Ohio for payment of an invoice Arrow submitted to NAVFAC on or about November 13, 2012.

77.     On or about April 30, 2013, CLARK sent and caused to be sent an approximately $713,705.07 invoice for payment to NAVFAC from Arrow.  On or about July 3, 2013, CLARK caused the transfer of approximately $706,314.11 from Arrow's bank account to Enola's bank account from the approximately $713,814.11 that Arrow received from DFAS-Cleveland in the

Northern District of Ohio for payment of Arrow's invoice submitted to NAVFAC on or about April 30, 2013.

78.    On or about January 15, 2014, CLARK caused Arrow to change the payment information in SAM that specified the bank account the government was to deposit contract payments from Arrow accounts at Hancock Bank in New Orleans, Louisiana, to an Enola account at PeoplesSouth Bank in Colquitt, Georgia.

79.    From on or about January 30 to on or about March 27, 2014, CLARK sent and caused to be sent an approximately $298,952.45 invoice for payment to NAVFAC from Arrow. On or about May 16, 2014, CLARK caused DFAS-Cleveland, located in the Northern District of Ohio, to transmit and cause to be transmitted by means of an interstate wire communication an order for a bank transfer of approximately $298,952.45, which was payment for the Arrow invoice submitted to NAVFAC from on or about January 30 to on or about March 27, 2014, in Enola's bank account at PeoplesSouth Bank in Colquitt, Georgia.

80.    As a result of the scheme, NAVFAC and DFAS-Cleveland paid Arrow approximately $2,853,111 for a contract for which Arrow was otherwise ineligible. CLARK, Reynolds and Dillard agreed to pass-through approximately 90 percent of the value of the contract to CLARK and Enola, in violation of the 8(a) Program regulations and the terms of the Test Track contract.

B.    USN Contract for Marine Corp Logistics Base (Craneway), Albany, Georgia – 2012-2015

81.    On or about September 29, 2012, NAVFAC contract N69450-12-C-2290 ("Craneway contract") was awarded to HDJ, with an initial value of $1,381,413.83 to "Design/Build Replace Craneway Windows," Building 2200, MCLB-Albany. The Craneway contract was awarded to HDJ under a sole source 8(a) set aside procurement solicitation, which

could only be awarded to a bona fide 8(a) Program small business concern and required that the prime contractor perform at least 15% of the total labor on the contract with its own employees. The final contract value was approximately $2,685,499.

82.     The Craneway contract included the 8(a) Program's prohibitions on subcontracting without prior written consent of the SBA and NAVFAC. CLARK, HOGAN, DANIELS, Enola, P&E, and HDJ failed to disclose to the SBA and NAVFAC, and only disclosed to LATHAM, who was offered and received things of value from CLARK and HOGAN, as described in Paragraph 58 and Count 1 of this Indictment, in return for favorable official acts as the opportunity arose, the fact that CLARK and Enola back-bonded HDJ. CLARK, HOGAN, and DANIELS also failed to disclose to NAVFAC that approximately 95 percent of the contract value was to be passed-through to Enola, which sub-contracted with P&E to perform the contract for HDJ.

83.     On or about October 10, 2012, CLARK, HOGAN, Enola, and P&E entered into a written subcontract with one another for labor and materials on the Craneway contract. The subcontract noted that all subcontractors for the Craneway contract were directly subcontracted with Enola and that P&E was to receive approximately 50 percent of the profits received from the contract between Enola and HDJ, wherein Enola contracted to furnish all labor and materials and perform all work required by HDJ in accordance with HDJ's contract with NAVFAC.

84.     The Craneway contract required HDJ to provide at least 15% of the total labor on the contract with its own employees. However, on or about October 16, 2012, DANIELS, CLARK, HDJ, and Enola executed a teaming agreement, dated September 12, 2012, wherein HDJ was to retain 5 percent of the contract revenue and subcontract to Enola 95 percent of the contract revenue payable within five days of receipt from the government. This arrangement was

not disclosed to the SBA or NAVFAC. On or about April 10, 2014, HOGAN certified an HDJ invoice to NAVFAC for payment of approximately $125,286.73. On or about April 23, 2014, HOGAN, CLARK, and DANIELS caused DFAS-Cleveland, located in the Northern District of Ohio, to transmit and cause to be transmitted by means of an interstate wire communication an order for a bank transfer of approximately $125,286.73, which was payment for the HDJ invoice submitted to NAVFAC on or about April 10, 2014, into an account at PeoplesSouth Bank in Colquitt, GA.

85.     On or about May 22, 2014, CLARK, HOGAN, and DANIELS caused the transfer of approximately $105,098.29 from HDJ's bank account to Enola's bank account of the approximately $125,286.73 payment HDJ received from DFAS-Cleveland for its April 10, 2014 invoice.

86.     On or about September 25, 2014, HOGAN certified an HDJ invoice to NAVFAC for payment of approximately $1,545,707. From on or about October 20 through October 27, 2014, HOGAN, CLARK and DANIELS caused DFAS-Cleveland, located in the Northern District of Ohio, to transmit and cause to be transmitted by means of an interstate wire communication an order for a bank transfer of approximately $1,545,707, which was payment for the HDJ invoice submitted to NAVFAC on or about October 20, 2014, into an account at PeoplesSouth Bank in Colquitt, GA.

87.     On or about November 6, 2014, CLARK caused the transfer of approximately $1,440,694.72 from HDJ's bank account to Enola's bank account of the approximately $1,545,707 payment HDJ received from DFAS-Cleveland for HDJ's September 25, 2014 invoice.

88.     As a result of the scheme, NAVFAC and DFAS-Cleveland paid HDJ approximately $2,683,146 that HDJ would not have received if NAVFAC and SBA knew that HDJ was acting as a pass-through for Enola and P&E and that HDJ was back-bonded by CLARK and Enola. CLARK, HOGAN, and DANIELS agreed to pass through approximately 95% of the value of the contract to CLARK, HOGAN, Enola, and P&E, in violation of the 8(a) Program regulations and terms of the Craneway contract.

C.     VA Contract for VA Medical Center West Atrium, Louisville, Kentucky – 2011-2014

89.     On or about June 27, 2011, VA contract VA249-C-0924 ("West Atrium contract") was awarded to P&E. The contract was valued at approximately $4,420,000.00 and was for the renovation and construction of the West Atrium Entrance of the Louisville, Kentucky, VA Medical Center. The contract was a 100 percent SDVOSB set-aside, which required that only bids from qualified SDVOSBs be considered.

90.     On or about June 28, 2011, HOGAN signed the West Atrium Contract to perform the work for approximately $4,420,000.00. HOGAN, CLARK, and ALFORD failed to disclose to the VA contracting officials that P&E was a pass-through for K&S, which managed nearly all of the work for the West Atrium contract and that CLARK and Enola assisted in obtaining the bonding and labor for the project.

91.     As discussed above in Paragraphs 60-71, on or about September 11, 2012, CVE determined that P&E did not meet the status requirements of a SDVOSB and in response, on or about September 14, 2012, CLARK e-mailed the VA contracting officer for the West Atrium contract and informed her that he transferred all of his stock back to HOGAN: "I will not be attending the meeting. In fact I am transferring my shares in P&E to Eric. My involvement from day 1 was to help Eric get his company off the [g]round and running, from inception through

today I have never taken one cent [o]ut of P&E . . ." CLARK's statement was false when in truth and fact, as he then well knew, he made an "off-line" agreement retaining his ownership interest in P&E and he agreed to back-bond P&E in exchange (1) for 49 percent ownership of P&E, and (2) fees taken from the contracts P&E was awarded.

92.    On or about May 23, 2013, CLARK executed a credit application with Labor Finders of Kentucky Inc. ("Labor Finders"), to provide temporary workers for P&E's West Atrium contract. CLARK listed Enola as the business filing the credit application. CLARK paid Labor Finders using Enola checks, which noted that the payments were for invoices corresponding to the West Atrium contract. The credit application listed ALFORD as the owner of K&S.

93.    On or about September 10, 2013, CLARK paid Labor Finders of Kentucky using a check from Enola for work on VA contract VA-249-C-0924.

94.    As a result of the scheme, VA paid P&E approximately $4,507,085 that P&E would not have received if the VA and CVE knew that P&E was acting as a pass-through for K&S and that P&E was back-bonded by CLARK and Enola.

D.    NASA Contract for Plum Brook Station, Sandusky, Ohio – 2013-2016

95.    On or about February 7, 2013, P&E submitted the winning bid for a NASA contract that bore ALFORD's name, signature and phone numbers, and further listed HOGAN's home address in Bonaire, Georgia, as contacts.

96.    On or about February 25, 2013, NASA contract NNC13CA07C ("the NASA contract") was awarded to P&E with an initial value of approximately $4,551,700 for the construction of the Security Main Gate Facility at NASA Plum Brook Station ("PBS") near Sandusky, Ohio, in the Northern District of Ohio. The NASA contract was awarded to P&E

23

under a SDVOSB set-aside procurement solicitation, which could only be awarded to a bona fide SDVOSB and required that at least 25% of the cost of performance incurred for personnel on the contract be spent on P&E's employees or employees of another bona fide SDVOSB.

97.     On or about March 21, 2013, CLARK, HOGAN, ALFORD and others attended the post-award conference at PBS for the NASA contract. HOGAN and CLARK presented CLARK as a business partner of P&E and obtained access to the PBS facility for him under the name "Allen Clark" listing P&E as his employer.

98.     HOGAN, CLARK, and ALFORD failed to disclose to the NASA contracting officials that P&E was a pass-through for K&S, which was not a bona fide SDVOSB. HOGAN, CLARK and ALFORD further failed to disclose that K&S generated the bid and managed nearly all of the work for NASA contract until in or around June 2014. HOGAN, CLARK, and ALFORD further failed to disclose that CLARK and Enola back-bonded P&E.

99.     On or about February 19, 2013, HOGAN e-mailed ALFORD to communicate how he wanted to structure the status and pay of K&S employees to "keep the VA off my [HOGAN's] back and keep my [HOGAN's] SDVOSB status." HOGAN further wrote that all employees must make less than his $5,000 per month salary but that "we can make up the difference through a sub-contract with K&S if you [ALFORD] want."

100.    On or about December 23, 2013, ALFORD certified a P&E payment request and invoice that was submitted to NASA for the payment of approximately $141,000.

101.    On or about January 15, 2014, HOGAN caused a wire transfer of $47,062.63 from P&E's bank account to K&S's bank account.

102.    On or about February 4, 2014, the NASA contracting officer ("NASA-CO") responsible for the NASA contract NNC13CA07C e-mailed ALFORD and asked him to provide

a detailed explanation of ALFORD's relationship to both K&S and P&E. The NASA-CO further asked how many P&E employees working on the NASA contract typically worked for K&S and whether ALFORD was paid as a K&S employee for his work on the NASA contract. On or about February 5, 2014, ALFORD responded to the NASA-CO's February 4, 2014, e-mail and stated that he was "an employee of [P&E] and [had] been for the last three (3) years," and that he did not draw a salary from K&S.

103.    From on or about April 24 through on or about May 5, 2014, CLARK, HOGAN and ALFORD transmitted and caused to be transmitted an invoice in the approximate amount of $182,000 by interstate electronic communication from Cleveland, Ohio, to the NASA Shared Services Center in Mississippi to process payment on P&E's invoice.

104.    From on or about May 22, through on or about May 28, 2014, CLARK, HOGAN and ALFORD transmitted and caused to be transmitted an invoice in the approximate amount of $286,180 by interstate electronic communication from Cleveland, Ohio, to the NASA Shared Services Center in Mississippi to process payment on P&E's invoice.

105.    On or about June 18, 2014, HOGAN e-mailed CLARK a subcontract from P&E to K&S, dated March 27, 2013, for the NASA contract with a total value of approximately $4,266,003 of the original $4,551,700 NASA contract to be paid to K&S rather than P&E.

106.    As a result of the scheme, NASA paid P&E approximately $5,613,828 that P&E would not have received if NASA and CVE knew that P&E was acting as a pass-through for K&S and that P&E was back-bonded by CLARK and Enola.

## COUNT 1
(Conspiracy to Commit Honest Services Wire Fraud, 18 U.S.C. § 1349)

The Grand Jury charges:

107.    The factual allegations of Paragraphs 1-3, 5-7, 9-14, 16-44, and 48-88 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

108.    At all times relevant to this Indictment, the United States, the United States Navy, the United States Marine Corps, the United States Department of Defense, and United States citizens and taxpayers had an intangible right to the honest services of their employees. As an employee and public official, Defendant KENNETH ALLEN LATHAM owed the United States, the United States Navy, the United States Marine Corps, the United States Department of Defense, and United States citizens and taxpayers a duty to refrain from receiving bribes and kickbacks in exchange for his official actions and decisions.

109.    From in or around June 2008 through in or around February 2016, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants JAMES ALLEN CLARK, ERIC LOUIE HOGAN, LATHAM, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree to commit a federal offense, that is, to devise a scheme and artifice to deprive the United States, the United States Navy, the United States Marine Corps, the United States Department of Defense, and United States citizens and taxpayers of their intangible right to the honest and faithful services of LATHAM through bribes and kickbacks, and the concealment of material information related thereto, and for purposes of executing such scheme and artifice to transmit and cause to be transmitted by means of wire communication in interstate commerce and writings, signs, signals, picture and sounds in violation of Title 18, United States Code, Sections 1343 and 1346.

## Objects of the Conspiracy

110.    It was an object of the conspiracy that CLARK, HOGAN and LATHAM, devised a scheme and artifice to defraud, including a scheme and artifice to deprive the United States, the United States Navy, the United States Marine Corps, the United States Department of Defense, and United States citizens and taxpayers of their intangible right to the honest services of LATHAM, by offering, soliciting and accepting bribes and kickbacks made to LATHAM in return for LATHAM taking favorable official action in connection with contracts beneficial to HOGAN and CLARK, both as requested and as opportunities arose.

## Manner and Means

It was part of the conspiracy that:

111.    CLARK, HOGAN, and others known and unknown, sought to enrich themselves through corruption by offering and providing things of value to LATHAM in exchange for official actions favorable to their companies, other companies serving as pass-through entities for CLARK and HOGAN, and companies for which CLARK provided back-bonding.

112.    LATHAM, and others known and unknown, sought to use LATHAM's official position to enrich themselves through corruption by soliciting and accepting things of value from CLARK, HOGAN, their companies, and others, in exchange for favorable official actions.

113.    CLARK, HOGAN, and others, gave, offered and agreed to give, directly and indirectly, things of value to Defendant LATHAM, to which he was not entitled, during the time that he served as a civilian engineering technician for the United States in exchange for LATHAM taking favorable official actions to benefit CLARK and HOGAN, both as requested and as specific opportunities arose.

114.     LATHAM used his official position to defraud the United States, the United States Navy, the United States Marine Corps, the United States Department of Defense, and United States citizens and taxpayers and benefit CLARK, HOGAN, their companies and others by, among other things, influencing and asserting pressure towards the awarding of contracts, approving invoices for payments on contracts, and concealing from the United States the fact that CLARK provided back-bonding to other companies.

115.     CLARK, HOGAN, LATHAM, and others known and unknown, concealed and attempted to conceal the bribes and kickbacks described in this Count of the Indictment from and prevent their detection by the United States, the United States Navy, the United States Marine Corps, the United States Department of Defense, United States citizens and taxpayers, the public and law enforcement, and to maintain LATHAM's continued employment with the United States so that HOGAN and CLARK could continue to provide him with things of value in return for favorable official actions.

Acts in Furtherance

116.     In furtherance of the conspiracy and to effect the objects thereof, CLARK, HOGAN, LATHAM and others known and unknown to the Grand Jury committed the following acts in the Northern District of Ohio, Eastern Division, and elsewhere.

117.     On or about September 25, 2008, HOGAN transferred approximately $1,000 from his USAA Account ending in 93-2 to LATHAM's account at Tyndall Federal Credit Union.

118.     On or about February 3, 2009, CLARK emailed HOGAN directing him to "Push [LATHAM] to have [a supervisory USN contract specialist at MCLB-Albany] use Enola on the water and sewer project" at MCLB-Albany under contract solicitation N69450-09-R-2264.

119.    On or about February 3, 2009, HOGAN replied to CLARK, "I talked to [LATHAM] abut [*sic*] it and he is working it."

120.    On or about February 4, 2009, CLARK emailed HOGAN, "Once he gets a commitment (if he does) from Contracting then we will go ahead and purchase the 4 wheeler for him (tell him this)."

121.    On or about February 5, 2009, the USN awarded contract N69450-09-C-2264 to Enola, in the amount of approximately $2,010,826.

122.    On February 11, 2009, HOGAN emailed CLARK and stated, "FYI – [LATHAM] is working on the other job for us ... he says it is a 50/50 chance.  Not great, but at least we got a chance.  He has also changed his mind about the 4 wheeler.  He now says he would rather have a fence in [h]is back yard.  I will find out more and we can talk later.  He stressed that he is not helping us with getting work for any return; it is only because we are a good contractor and it would make his life easier if someone like us got the work."

123.    On or about February 18, 2009, HOGAN and LATHAM exchanged emails in which LATHAM asked HOGAN to "update my resume with this new info, ASAP.  Thanks.  I need to show the navy I can walk on water."   LATHAM later provided HOGAN with his home address.

124.    On or about March 17, 2009, CLARK emailed HOGAN and asked, "any good news from [LATHAM] the fence man ... ????"

125.    On or about and between March 18 through March 23, 2009, LATHAM approved invoices for payment to Enola on Contract N69450-09-C-2264 for approximately $96,809.21.  As a result of LATHAM's approval, on or about March 31, 2009, LATHAM, CLARK and

HOGAN caused DFAS-Cleveland to transmit approximately $96,809.21 to a Regions Bank Account ending in 1960 in Florida.

126.    On or about April 2, 2009, HOGAN emailed CLARK and stated "[Another government employee] does not accept anything from any contractor (lunch, deer meat, or anything) for fear that someone will see it. However, he and I were good friends when I was in the military. To me this is not a maybe…I am expecting [LATHAM] to come through for us, but he [won't] say for sure. He just says that he is doing his best. He is also looking to get us the demo of three buildings on the base."

127.    On or about the following dates, LATHAM approved invoices submitted by CLARK and HOGAN for Enola's work on Contract N69450-09-C-2264, which were then submitted and caused to be submitted to DFAS-Cleveland, and further caused DFAS-Cleveland to transmit and cause to be transmitted by means of an interstate wire communication an order for a bank transfer for payment to Enola's accounts at Regions Bank of Florida, each act constituting a separate act in furtherance of the conspiracy:

|     | Appx. Dates LATHAM Approved Invoice | Appx. Amount | Appx. Date DFAS-Cleveland Wired Payment | Appx. Amount |
| --- | --- | --- | --- | --- |
| a. | April 21-29, 2009 | $355,128.26 | May 13, 2009 | $355,239.24 |
| b. | May 23 – June 3, 2009 | $114,350.19 | June 15, 2019 | $114,350.18 |
| c. | June 22-30, 2009 | $187,687.56 | July 14, 2009 | $187,687.56 |
| d. | July 16 – August 3, 2009 | $314,080.17 | August 12, 2009 | $314,080.17 |
| e. | August 17 – September 3, 2009 | $277,445.19 | September 15, 2009 | $277,445.19 |
| f. | September 15 – October 3, 2009 | $186,446.15 | October 14, 2009 | $186,446.15 |
| g. | October 19-29, 2009 | $214,290.99 | November 13, 2009 | $214,290.99 |
| h. | October 19 – December 2, 2009 | $244,831.92 | December 11, 2009 | $244,831.92 |
| i. | December 15-21, 2009 | $19,756.37 | January 19, 2010 | $19,756.37 |

128.    On or about May 25, 2012, LATHAM entered into a "Hunt Contract and Release Agreement" with HOGAN and a hunting company for a hunting trip to take place on or about

October 1 through October 6, 2012. The cost of the hunting trip was approximately $5,000 for both HOGAN and LATHAM.

129. On or about June 5, 2012, HOGAN issued a P&E business check for approximately $5,000 to the hunting company referenced above. The memo line for the check read "Client Entertainment."

130. From on or about October 1 through 6, 2012, HOGAN took LATHAM on an approximately $5,000 hunting trip in or around Springfield, Illinois. HOGAN used P&E business accounts to pay for the hunting trip.

131. On or about October 4, 2012, CW-1 issued and caused to be issued a letter to NAVFAC disclosing CLARK's and Enola's back-bonding of Daniels and HDJ on contract N69450-11-C-2290, even though Enola was not a qualified 8(a) contractor. CW-1 provided this letter to CLARK and HOGAN. This letter was subsequently presented by CLARK and HOGAN to LATHAM, who failed to disclose the same letter to other contracting authorities at NAVFAC and the DoN.

132. On or about the following dates, LATHAM approved estimates of expected costs that CLARK, LATHAM and Dillard caused to be submitted for Arrow's work on contract N69450-11-C-2269, which were then submitted and caused to be submitted as invoices for payment to the NAVFAC and caused DFAS-Cleveland to transmit and cause to be transmitted by means of an interstate wire communication an order for a bank transfer for payment to Arrow's accounts at Hancock Bank in New Orleans, Louisiana, and transfers made to CLARK's account at PeoplesSouth Bank in Colquitt, Georgia, each act constituting a separate act in furtherance of the conspiracy:

| | Appx. Dates LATHAM Approved Estimates of Expected Costs | Appx. Amount | Appx. Dates Invoices Submitted to NAVFAC | Appx. Amount | Appx. Date DFAS-Cleveland Wired Payment | Appx. Amount | Appx. Date of Transfer from Arrow Acct. to Enola by Check | Appx. Amount |
|---|---|---|---|---|---|---|---|---|
| a. | August 10, 2012 | $305,050.60 | August 22, 2012 | $305,050.60 | September 19, 2012 | $305,050.60 | September 20, 2012 | $255,000 |
| b. | September 28, 2012 | $210,766.96 | October 3, 2012 | $210,766.96 | October 29, 2012 | $210,766.96 | November 6, 2012 | $195,766 |
| c. | November 9, 2012 | $587,175.83 | November 13, 2012 | $587,175.83 | November 27, 2012 | $587,290 | December 4, 2012 | $537,290 |
| d. | February 22, 2013 | $498,771.87 | March 1, 2013 | $498,771.87 | March 14, 2013 | $410,111.87 | March 21, 2013 | $380,111.87 |
| e. | April 26, 2013 | $829,645.07 | April 30, 2013 | $713,705.07 | June 28, 2013 | $713,814.11 | July 3, 2013 | $706,314.11 |

133.    In or around early 2013, the Naval Criminal Investigation Service, the U.S. Department of Justice and local law enforcement in Albany, Georgia, made public an investigation into corruption at MCLB-Albany.  This investigation concerned the solicitation, acceptance and offering of things of value between MCLB employees and outside vendors.  On or about April 3, 2013, CLARK emailed HOGAN and stated, "Meet at 11:30 for lunch. L[ATHAM] want to meet us ??"  HOGAN replied that same day, "[LATHAM] is too afraid of someone seeing us together. He wants to but believe it would be the best for all that we don't."

134.    On or about February 25, 2014, LATHAM emailed HOGAN and stated, "[Lee County, Georgia] dad, son to be sentenced."  The email included a local news report concerning a Lee County, Georgia, father and son that pled guilty to providing bribes and kickbacks in connection with a federal loan fraud scheme.  HOGAN replied, "Good to see … Thanks."

135.    On or about the following date, LATHAM approved estimates of expected costs submitted for HDJ's work on contract N69450-12-C-2290, which were then submitted and

caused to submitted by HOGAN, LATHAM, Daniels and others known and unknown as
invoices for payment to the NAVFAC and caused DFAS-Cleveland to transmit and cause to be
transmitted by means of an interstate wire communication an order for a bank transfer for
payment to HDJ's accounts at PeoplesSouth Bank in Colquitt, Georgia, and subsequent transfers
made to Enola's account at PeoplesSouth Bank by check:

| Appx. Dates LATHAM Approved Estimates of Expected Costs | Appx. Amount | Appx. Dates Invoices Submitted to NAVFAC | Appx. Amount | Appx. Date DFAS-Cleveland Wired Payment | Appx. Amount | Appx. Date of Transfer from HDJ Acct. to Enola by Check | Appx. Amount |
|---|---|---|---|---|---|---|---|
| April 10, 2014 | $125,286.73 | April 10, 2014 | $125,286.73 | April 23, 2014 | $125,286.73 | May 22, 2014 | $105,098.29 |

136.　　On or about the following date, LATHAM approved invoices submitted to

NAVFAC for HDJ's work on contract N69450-12-C-2290, which were then submitted and

caused to be submitted by HOGAN, Daniels, HDJ and others known and unknown and caused

DFAS-Cleveland to transmit and cause to be transmitted by means of an interstate wire

communication an order for a bank transfer for payment to HDJ's accounts at PeoplesSouth

Bank in Colquitt, Georgia, and subsequent transfers made to Enola's account in PeoplesSouth

Bank by check:

| Appx. Dates Invoices Submitted to NAVFAC | Appx. Amount | Appx. Dates LATHAM Approved Invoice | Appx. Amount | Appx. Date DFAS-Cleveland Wired Payment | Appx. Amount | Appx. Date of Transfer from HDJ Acct. to Enola by Check | Appx. Amount |
|---|---|---|---|---|---|---|---|
| September 25, 2014 | $1,545,707 | September 30, 2014 | $1,545,707 | October 27, 2014 | $1,545,707 | November 6, 2014 | $1,440,694.72 |

137.     On or about the following dates, LATHAM approved invoices submitted to

NAVFAC for HDJ's work on contract N69450-12-C-2290, which were submitted and caused to

be submitted by HOGAN, Daniels, HDJ and others known and unknown and caused DFAS-

Cleveland to transmit and cause to be transmitted by means of an interstate wire communication

an order for a bank transfer for payment to HDJ's account at PeoplesSouth Bank in Colquitt,

Georgia, each act constituting a separate act in furtherance of the conspiracy:

| | Appx. Dates Invoices Submitted to NAVFAC | Appx. Amount | Appx. Dates LATHAM Approved Invoice | Appx. Amount | Appx. Date DFAS-Cleveland Wired Payment | Appx. Amount |
|---|---|---|---|---|---|---|
| a. | December 18, 2014 | $223,079.22 | December 19, 2014 | $223,079.22 | January 9, 2015 | $223,079.22 |
| b. | February 6, 2015 | $267,621 | February 6, 2015 | $267,621 | February 20, 2015 | $240,858.90 |

138.     From in or around January 2015 through October 2015 HOGAN and CLARK

attempted to resolve the sharing of proceeds from their conspiracies to defraud the United States,

the United States Navy, the United States Marine Corps, the United States Department of

Defense, and United States citizens and taxpayers of their intangible right to the honest services

of LATHAM through bribes and kickbacks, and to defraud the United States as contemplated in

Count 2 of this Indictment by obtaining contracts to which CLARK, HOGAN, Daniels, Alford

and others were not otherwise entitled.   On or about and between October 19, 2015, through

October 21, 2015, HOGAN and CLARK exchanged the following text messages:

HOGAN:     Any word on when I can expect to be paid back.  I am $100,000.00
shy to pay the job off.  If I don't get them paid you know that
Hartford will be looking at you for payment too.

HOGAN:     Are you not going to answer?

| CLARK: | No .. I have told you 15 times .. You will be the second person I pay.. As much as I have done for you.. I don't appreciate you harassing me.. In 2003 I made you $300k from a subcontract with Brassfield Gorrie.. I made 8 trips to Orlando cost me over $50k and you pocketed the entire $300k.. I signed for $11mil of bonds cost me another $125,000... You will get your f[*****]g money back as soon as I get it |
|---|---|
| HOGAN: | Funny how you forget the money you made from me. The two jobs at the MCLB netted you over $1M |
| HOGAN: | Not to mention the 500k you pocketed great M the windowbjob. |
| CLARK: | Funny how you forget you made a salary and bonus ..you had nothing to do with the window job ... I got that from Patti.. Who I did. 6-7 jobs before I ever met you or the bribe money I paid [LATHAM] for the two jobs you got. |

139.    From in or around October 2015 through in or around February 2016, CLARK and HOGAN continued to attempt to resolve the sharing of their proceeds in their shared conspiracies to defraud the United States, and continued to submit invoices for payment on government contracts, which were paid by interstate bank transfers from DFAS-Cleveland.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 – 19
(Honest Services Wire Fraud, 18 U.S.C. §§ 1343 and 1346)

The Grand Jury Further Charges:

140.    The factual allegations of Paragraphs 1-3, 5-7, 9-14, 16-44, 48-88, 108, 111-115, and 117-139 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

141.    From in or around June 2008 through in or around February 2016, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants JAMES ALLEN CLARK, ERIC LOUIE HOGAN, KENNETH ALLEN LATHAM, and others known and unknown to the Grand Jury, devised and intended to devise a scheme to defraud, that is, to deprive the United States, the United States Navy, the United States Marine Corps, the United States Department of Defense, and United States citizens and taxpayers of their intangible right to the honest services of LATHAM, by offering, soliciting and accepting bribes and kickbacks made to LATHAM in return for LATHAM taking favorable official action in connection with contracts beneficial to HOGAN and CLARK, both as requested and as opportunities arose.

142.    For the purpose of executing the scheme and attempting to do so, the Defendants CLARK, HOGAN, LATHAM, and others known and unknown, on or about dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, transmitted and caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| Count | Contract No. and Prime Contractor | Appx. Date | Originating Location | Recipient Location | Description and Appx. Amount |
|---|---|---|---|---|---|
| 2 | N69450-09-C-2264 Enola | March 31, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $96,809.21 |
| 3 | N69450-09-C-2264 Enola | May 13, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $355,239.24 |
| 4 | N69450-09-C-2264 Enola | June 15, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $114,350.18 |
| 5 | N69450-09-C-2264 Enola | July 14, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $187,687.56 |
| 6 | N69450-09-C-2264 Enola | August 12, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $314,080.17 |
| 7 | N69450-09-C-2264 Enola | September 15, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $277,445.19 |
| 8 | N69450-09-C-2264 Enola | October 14, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $186,446.15 |
| 9 | N69450-09-C-2264 Enola | November 13, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $214,290.99 |
| 10 | N69450-09-C-2264 Enola | December 11, 2009 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $244,831.92 |
| 11 | N69450-09-C-2264 Enola | January 19, 2010 | Cleveland, Ohio | Chipley, Florida | DFAS Cleveland Wire Transmission $19,756.37 |
| 12 | N69450-11-C-2269 Arrow | September 19, 2012 | Cleveland, Ohio | New Orleans, Louisiana | DFAS Cleveland Wire Transmission $305,050.60 |
| 13 | N69450-11-C-2269 Arrow | October 29, 2012 | Cleveland, Ohio | New Orleans, Louisiana | DFAS Cleveland Wire Transmission $210,766.96 |
| 14 | N69450-11-C-2269 Arrow | November 27, 2012 | Cleveland, Ohio | New Orleans, Louisiana | DFAS Cleveland Wire Transmission $587,290 |
| 15 | N69450-11-C-2269 Arrow | March 14, 2013 | Cleveland, Ohio | New Orleans, Louisiana | DFAS Cleveland Wire Transmission $410,111.87 |

| 16 | N69450-11-C-2269 Arrow | June 28, 2013 | Cleveland, Ohio | New Orleans, Louisiana | DFAS Cleveland Wire Transmission $713,814.11 |
| 17 | N69450-12-C-2290 HDJ | April 23, 2014 | Cleveland, Ohio | Colquitt, Georgia | DFAS Cleveland Wire Transmission $125,286.73 |
| 18 | N69450-12-C-2290 HDJ | October 27, 2014 | Cleveland, Ohio | Colquitt, Georgia | DFAS Cleveland Wire Transmission $1,545,707 |
| 19 | N69450-12-C-2290 HDJ | January 9, 2015 | Cleveland, Ohio | Colquitt, Georgia | DFAS Cleveland Wire Transmission $223,079.22 |
| 20 | N69450-12-C-2290 HDJ | February 20, 2015 | Cleveland, Ohio | Colquitt, Georgia | DFAS Cleveland Wire Transmission $240,858.90 |

All in violation of Title 18, United States Code, Section 1343 and 1346.

## COUNT 21
(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349)

The Grand Jury further charges:

143.    The factual allegations of Paragraphs 1-2, 4-56, 59-106, 131-132, 135-137 and 139 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## The Conspiracy

144.    From on or about October 18, 2010, through on or about February 27, 2015 in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES ALLEN CLARK, ERIC LOUIE HOGAN, JAMES KEVIN ALFORD, HARVEY DANIELS, JR. and others presently known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree to devise and intend to devise a scheme and artifice to defraud and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signals, signs, pictures and sounds, that is, to

knowingly cause interstate wire communications to be made in furtherance of said scheme and artifice to defraud, all in violation of Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

145.     It was an object of the conspiracy for CLARK, HOGAN, ALFORD, DANIELS and others known and unknown to the Grand Jury to enrich themselves by obtaining government contracts they were ineligible to receive, to wit:

| Agency | Contract No. and Prime Contractor | Approximate Amount Paid by Government | Approximate Award Date | Procurement Type |
|--------|-----------------------------------|---------------------------------------|------------------------|------------------|
| **VA** | VA249-C-0924 P&E | $4,517,085 | June 27, 2011 | SDVOSB Set-Aside |
| **USN, NAVFAC** | N69450-11-C-2269 Arrow | $2,853,111 | September 26, 2011 | Sole Source 8(a) Set-Aside |
| **USN, NAVFAC** | N69450-12-C-2290 HDJ | $2,683,146 | September 29, 2012 | Sole Source 8(a) Set-Aside |
| **NASA** | NNC13CA07C P&E | $5,613,828 | February 25, 2013 | SDVOSB Set-Aside |

## Manner and Means of the Conspiracy

It was part of the conspiracy that:

146.     CLARK, HOGAN, ALFORD, DANIELS, and others known and unknown to the Grand Jury, made false representations and provided false documents to the USN, SBA, VA, CVE, and NASA to receive 8(a) and SDVOSB set-aside contracts.

147.     CLARK, HOGAN, DANIELS, and others known and unknown to the Grand Jury, made false representations and provided false documents to the SBA, and CVE regarding CLARK's leadership, management, and ownership interests in potentially program eligible companies in order to have the SBA, and CVE approve, reinstate, or maintain those companies in the 8(a) and SDVOSB Programs.

148.    CLARK, HOGAN, ALFORD, DANIELS, and others known and unknown to the Grand Jury, used qualified or eligible participants in the 8(a) and SDVOSB Programs to serve as proxies through which to obtain pass-through contracts with the United States.

149.    CLARK, HOGAN, DANIELS, and others known and unknown to the Grand Jury, made false representations and provided false documents to the SBA and CVE regarding the bonding capacity of, and CLARK's involvement in obtaining bonds for, certain potentially program-eligible companies in order to ensure that those companies would be eligible to bid and obtain contracts with the government.

150.    CLARK, HOGAN, ALFORD, DANIELS, and others known and unknown to the Grand Jury used the fraudulently and falsely obtained status of program-eligible companies to obtain government contracts for which they were otherwise ineligible or incapable of obtaining.

151.    CLARK, HOGAN, ALFORD, DANIELS, and others known and unknown to the Grand Jury, used their fraudulently and falsely obtained status as program eligible companies to submit invoices for payments on government contracts for which they were otherwise ineligible or incapable of obtaining, and further caused to be transmitted by means of interstate wire transmissions orders to transfer payments from the United States to accounts controlled by them.

<u>Acts in Furtherance</u>

152.    In furtherance of the conspiracy and in order to effect its objects and conceal its existence, the Defendants and others known and unknown to the Grand Jury committed one or more of the following acts in the Northern District of Ohio and elsewhere:

153.    As acts in furtherance, the allegations of Paragraphs 59-106, 131-132, 135-137 and 139 of the Indictment are re-alleged and incorporated as if fully rewritten herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 22 THROUGH 26
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

154.　The factual allegations of Paragraphs 1-2, 4-56, 59-106, 131-132, 135-137, 139 and 146-151 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

155.　From on or about October 18, 2010, to on or about February 27, 2015, the defendants listed below, devised and intended to devise a scheme to defraud the United States, the USN and NASA, to wit, the scheme to defraud described in Paragraphs 59-106, and 146-151 of this Indictment, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### Execution of the Scheme

156.　On or about each of the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| Count | Defendant | Approximate Date | Originating Location | Recipient Location | Description (Approximate Amounts) |
|---|---|---|---|---|---|
| **NASA Contract NNC13CA07C** | | | | | |
| 22 | CLARK HOGAN ALFORD | May 5, 2014 | NASA Cleveland, OH | NASA Stennis Space Center, MS | NASA authorized payment of P&E Pay Request #13 for $182,000 |
| 23 | CLARK HOGAN ALFORD | May 28, 2014 | NASA Cleveland, OH | NASA Stennis Space Center, MS | NASA authorized payment of |

| | | | | | P&E Pay Request #14 for $286,180 |
|---|---|---|---|---|---|
| USN, NAVFAC Contract N69450-11-C-2269 | | | | | |
| 24 | CLARK | May 16, 2014 | DFAS Cleveland, OH | PeoplesSouth Bank Colquitt, GA | $298,952.45 |
| USN, NAVFAC Contract N69450-12-C-2290 | | | | | |
| 25 | CLARK HOGAN DANIELS | April 23, 2014 | DFAS Cleveland, OH | PeoplesSouth Bank Colquitt, GA | $125,286.73 |
| 26 | CLARK HOGAN DANIELS | October 27, 2014 | DFAS Cleveland, OH | Peoples South Bank Colquitt, GA | $1,545,707 |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 27
(Conspiracy to Submit False Claims, 18 U.S.C. § 286)

The Grand Jury further charges:

157.    The factual allegations of Paragraphs 1-2, 4, 6-9, 13-15, 19-20, 22-47, 54-56, 59-72, 89-106, and 146-151 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

158.    From on or about November 5, 2012, to on or about February 27, 2015, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants, JAMES ALLEN CLARK, ERIC LOUIE HOGAN, and JAMES KEVIN ALFORD and other persons known and unknown to the Grand Jury, knowingly and willfully entered into an agreement, combination and conspiracy with each other to defraud the United States, and NASA, by obtaining and aiding to obtain the payment and allowance of false, fictitious and fraudulent claims in the manner and means described above in Paragraphs 146 through 151.

## Objects of the Conspiracy

159.    It was an object of the conspiracy that defendants CLARK, HOGAN, ALFORD and others known and unknown to the Grand Jury enriched themselves by obtaining the proceeds of NASA contract payments caused by the submission of false and fraudulent invoices and requests for payments submitted to NASA.

## Manner and Means of the Conspiracy

It was part of the conspiracy that:

160.    Defendant HOGAN submitted false and fraudulent documents to CVE in order to have P&E verified as an SDVOSB, as discussed in Paragraphs 59-71 of this Indictment.

161.    Defendant ALFORD represented himself as a long-time P&E employee to NASA contracting officials to conceal the fact that P&E had subcontracted the majority of the contract to K&S.

162.    Defendant HOGAN and ALFORD submitted requests for payment and invoices to NASA that certified that the payment requests were for performance in accordance with the specifications, terms and conditions of the NASA contract.

163.    Defendant CLARK and HOGAN entered into an indemnity agreement with the Surety Company 1 in order to have bonds issued for P&E contracts and concealed that arrangement from CVE and NASA contracting officials.

164.    Defendant HOGAN and ALFORD falsely and fraudulently structured the employment status and pay of K&S employees, and then submitted P&E payroll summaries based on this misleading information to the VA and NASA, to make it appear that P&E was complying with SDVOSB program rules.

## Acts in furtherance of the Conspiracy

165.     In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed acts in the Northern District of Ohio and elsewhere, including, but not limited to:

166.     On or about February 5, 2014, ALFORD e-mailed the NASA-CO responsible for the NASA contract and stated that he was "an employee of [P&E] and [had] been for the last three (3) years," in response to the NASA-CO requiring a detailed explanation Alford's relationship to both K&S and P&E.

167.     HOGAN and ALFORD executed a subcontract for approximately $4,266,003 for K&S to perform the NASA contract.

168.     On or about April 23, 2013, HOGAN certified and submitted an invoice to NASA for payment for performance purported to be in accordance with the specifications, terms and conditions of the NASA contract.

169.     On or about December 23, 2013, ALFORD certified and submitted an invoice to NASA for payment for performance purported to be in accordance with the specifications, terms and conditions of the NASA contract.

All in violation of Title 18, United States Code, Section 286.

### COUNTS 28 THROUGH 49
(False Claims, 18 U.S.C. § 287)

The Grand Jury further charges:

170.     The factual allegations of Paragraphs 1-2, 4, 6-9, 13-15, 19-20, 22-47, 54-56, 59-72, 89-106, 146-151, 160-164, and 166-169 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

171.    On or about each of the dates set forth below, in the Northern District of Ohio,

Eastern Division, and elsewhere, the Defendants noted below made and presented to NASA

claims upon and against the United States and NASA, described below for each count, knowing

that the claim was false, fictitious and fraudulent, each claim constituting a separate count:

| Count | Defendants | Approximate Date Claim Submitted | Approximate Amount Claimed |
|---|---|---|---|
| 28 | CLARK HOGAN ALFORD | 3/24/2014 | $171,000.00 |
| 29 | CLARK HOGAN ALFORD | 4/24/2014 | $182,000.00 |
| 30 | CLARK HOGAN ALFORD | 5/22/2014 | $296,900.00 |
| 31 | CLARK HOGAN | 6/30/2014 | $183,138.60 |
| 32 | CLARK HOGAN | 7/14/2014 | $108,224.00 |
| 33 | CLARK HOGAN | 7/23/2014 | $177,262.32 |
| 34 | CLARK HOGAN | 8/20/2014 | $359,421.19 |
| 35 | CLARK HOGAN | 9/24/2014 | $416,234.77 |
| 36 | CLARK HOGAN | 10/22/2014 | $327,121.14 |
| 37 | CLARK HOGAN | 12/2/2014 | $475,419.34 |
| 38 | CLARK HOGAN | 1/5/2015 | $132,222.00 |
| 39 | CLARK HOGAN | 1/28/2015 | $67,788.55 |
| 40 | CLARK HOGAN | 2/26/2015 | $89,435.00 |
| 41 | CLARK HOGAN | 3/18/2015 | $94,750.00 |
| 42 | CLARK HOGAN | 4/22/2015 | $40,034.75 |
| 43 | CLARK HOGAN | 5/21/2015 | $95,597.55 |

| Count | Defendants | Approximate Date Claim Submitted | Approximate Amount Claimed |
|-------|------------|----------------------------------|----------------------------|
| 44 | CLARK HOGAN | 6/23/2015 | $215,994.08 |
| 45 | CLARK HOGAN | 7/22/2015 | $186,222.02 |
| 46 | CLARK HOGAN | 8/24/2015 | $64,300.00 |
| 47 | CLARK HOGAN | 10/19/2015 | $134,696.29 |
| 48 | CLARK HOGAN | 11/19/2015 | $172,595.00 |
| 49 | CLARK HOGAN | 2/27/2016 | $29,379.95 |

All in violation of Title 18, United States Code, Section 287 and 2.

## COUNTS 50-71
(Major Fraud, 18 U.S.C. § 1031)

The Grand Jury further charges:

172.    Paragraphs 1-2, 4, 6-9, 15, 19-20, 22-47, 54-56, 59-72, 95-106, 146-151, 160-164, and 166-169 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

173.    On or about February 25, 2013, the United States, in a procurement of services, awarded prime NASA contract number NNC13CA07C to P&E, the value of said prime contract being in excess of $1,000,000.

174.    Beginning on or about January 17, 2013, and continuing up to on or about February 27, 2016, in connection with the foregoing procurement, the defendants CLARK, HOGAN, and ALFORD, devised a scheme and artifice to defraud the United States and NASA, that is, the scheme to defraud described in Paragraphs 59-71 and 95-106 of the Indictment, to obtain money or property by means of false and fraudulent pretenses, representations and promises.

175.    It was part of the scheme and artifice to defraud the United States and NASA and to obtain money and property by means of false and fraudulent pretenses, representations and promises that the Defendants CLARK, HOGAN and ALFORD would and did employ those manners and means described in Paragraphs 146-151 and 160-164 of the Indictment and incorporated and re-alleged as if set forth fully herein.

176.    On or about each of the dates set forth below, the defendants noted below, in the Northern District of Ohio, Eastern Division, and elsewhere, knowingly executed and attempted to execute the scheme and artifice as described above with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations and promises, by submitting and causing to be submitted claims for payments in amounts noted below that falsely and fraudulently claimed that work was performed in accordance with the specifications, terms and conditions of the NASA contract, as follows:

| Count | Defendants | Approximate Date Claim Submitted | Approximate Amount Claimed |
|---|---|---|---|
| 50 | CLARK HOGAN ALFORD | 3/24/2014 | $171,000.00 |
| 51 | CLARK HOGAN ALFORD | 4/24/2014 | $182,000.00 |
| 52 | CLARK HOGAN ALFORD | 5/22/2014 | $296,900.00 |
| 53 | CLARK HOGAN | 6/30/2014 | $183,138.60 |
| 54 | CLARK HOGAN | 7/14/2014 | $108,224.00 |
| 55 | CLARK HOGAN | 7/23/2014 | $177,262.32 |
| 56 | CLARK HOGAN | 8/20/2014 | $359,421.19 |
| 57 | CLARK HOGAN | 9/24/2014 | $416,234.77 |

| Count | Defendants | Approximate Date Claim Submitted | Approximate Amount Claimed |
|---|---|---|---|
| 58 | CLARK HOGAN | 10/22/2014 | $327,121.14 |
| 59 | CLARK HOGAN | 12/2/2014 | $475,419.34 |
| 60 | CLARK HOGAN | 1/5/2015 | $132,222.00 |
| 61 | CLARK HOGAN | 1/28/2015 | $67,788.55 |
| 62 | CLARK HOGAN | 2/26/2015 | $89,435.00 |
| 63 | CLARK HOGAN | 3/18/2015 | $94,750.00 |
| 64 | CLARK HOGAN | 4/22/2015 | $40,034.75 |
| 65 | CLARK HOGAN | 5/21/2015 | $95,597.55 |
| 66 | CLARK HOGAN | 6/23/2015 | $215,994.08 |
| 67 | CLARK HOGAN | 7/22/2015 | $186,222.02 |
| 68 | CLARK HOGAN | 8/24/2015 | $64,300.00 |
| 69 | CLARK HOGAN | 10/19/2015 | $134,696.29 |
| 70 | CLARK HOGAN | 11/19/2015 | $172,595.00 |
| 71 | CLARK HOGAN | 2/27/2016 | $29,379.95 |

All in violation of Title 18, United States Code, Sections 1031 and 2.

## FORFEITURE

The Grand Jury further charges:

177.    The allegations of Counts 1 through 26, inclusive, are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). As a result of the foregoing offenses, Defendants JAMES ALLEN CLARK, ERIC LOUIE HOGAN, KENNETH ALLEN LATHAM, JAMES KEVIN ALFORD, and HARVEY DANIELS, JR.,

shall forfeit to the United States all property, real and personal, which constitutes, or is derived from, proceeds traceable to the commission of the offenses.

## SUBSTITUTE PROPERTY

178.    In the event that any property subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant(s):

a.)    cannot be located upon exercise of due diligence;

b.)    has been transferred or sold to, or deposited with, a third party;

c.)    has been placed beyond the jurisdiction of the court;

d.)    has been substantially diminished in value; or,

e.)    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) [as incorporated by Title 28, United States Code, Section 2461(c)], to seek forfeiture of any other property of the defendant(s) up to the amount equivalent to the value of the forfeitable property described above.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.