UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------

| | | |
|---|---|---|
| UNITED STATES, | : | |
| | : | Case No. 1:19-cr-148 |
| Plaintiff, | : | |
| | : | |
| vs. | : | OPINION & ORDER |
| | : | [Resolving Doc. 237] |
| JAMES ALLEN CLARK, | : | |
| | : | |
| Defendant. | : | |

------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On September 26, 2019, the United States charged James Allen Clark with thirty-one-counts related to alleged schemes to defraud government agencies.[1]  The Government alleged that Clark conspired with four codefendants to illegally obtain set-aside and sole-source government construction contracts.

The Government claims that Clark worked on government construction contracts by misrepresenting that his codefendants would supervise and perform the construction contracts.  The Government says the codefendants fronted for the contracts and that Clark's company gave major financial backing for the projects and performed most of the contract work.

On November 6, 2019, a jury convicted Clark on thirteen counts for wire fraud, false claims, major fraud, and conspiracy charges.[2]

On November 20, 2019, Clark moved for a judgment of acquittal notwithstanding the verdict on the thirteen counts.[3]  In the alternative, Clark moved for a new trial.[4]  The

---

[1] Doc. 145.  The Government originally charged Clark with seventy-one criminal counts on March 13, 2019. Doc. 1.
[2] Doc. 223.
[3] Doc. 237.
[4] *Id.*

Case No. 1:19-cr-148
Gwin, J.

Government opposed;[5] Clark replied.[6]

Upon review, the Court **DENIES** Clark's motion for a judgment of acquittal on most of the charges because enough evidence supports the jury's verdict. On the false claims charges related to the NASA Plum Brook contract, insufficient evidence supported the convictions and the Court **GRANTS** Defendant Clark's motion for judgment of acquittal on those charges.

The Court **DENIES** Defendant's motion for a new trial. At the Government's request, the Court wrongly allowed the United States to give cooperating witness testimony that those witnesses had already admitted that a conspiracy existed. But, a new trial is not warranted because Clark was not sufficiently prejudiced by the admission of his codefendants' guilty pleas.

## I.    Background

From 1997 until 2015, James Allen Clark acted as the vice-president of Enola Contracting Services.[7] From 2000 until 2009, Enola participated in the Small Business Administration's 8(a) program.[8]

The Small Business Administration's 8(a) Business Development Program is a federal government procurement program to help small disadvantaged businesses obtain sole-source and set-aside contracts.[9] Under the 8(a) Program, only certified program participants can compete for the 8(a) Program contracts.[10] To be eligible, businesses have

---

[5] Doc. 247.
[6] Doc. 258.
[7] Doc. 145 ¶ 37.
[8] *Id.* ¶ 38. Clark understood the 8(a) regulations well. Doc. 213 at 188-90.
[9] Doc. 145 ¶ 25.
[10] *Id.* ¶ 25. "A 'sole-source' award was directed to a specific small business and a 'set-aside' award was limited to a particular category of businesses that met the relevant SBA program participation criteria." *Id.* ¶ 23.

-2-

Case No. 1:19-cr-148
Gwin, J.

to meet certain criteria—including being at least 51 percent unconditionally owned and controlled by a socially and economically disadvantaged individual.[11]  The 8(a) Program allows its participant companies to receive contract help from other companies but requires the certified contractor retain control of the 8(a) Program participant.[12]  The 8(a) Program certification is time limited.

In 2009, Enola graduated from the 8(a) Program.  After this 2009 program graduation, Enola lost eligibility to receive further 8(a) Program set-aside and sole-source contracts.  At the time of the government contracts in this case, Enola was a successful and profitable construction business.[13]  Reflecting this past construction completion success, Enola had access to significant bonding ability.

8(a) Program contracts require 8(a) Program contractors to post contract and performance bonding.  Typically, construction companies and their owners co-sign and guarantee construction completion bonds.[14]  With those indemnification and guarantee agreements, owners and construction companies commit to reimburse bonding companies for any default completion expenses absorbed by the bonding company.[15]  Past construction completion success and free financial resources control a construction company's ability to obtain construction payment and performance bonding.[16]

The Government says that Defendant Clark used Enola's bonding capacity to exercise control over 8(a) companies Arrow Construction Group, LLC, and HDJ Security,

---

[11] *Id.* ¶¶ 26-27.
[12] *Id.*
[13] Doc. 243 at 154-56.
[14] Doc. 213 at 105; Doc. 145 ¶ 35.
[15] Doc. 213 at 270-71; Doc. 145 ¶ 35.
[16] Doc. 213 at 105.

Case No. 1:19-cr-148
Gwin, J.

Inc.[17]  The Government argued that Clark gained control of these 8(a) Program companies'

projects and used them as proxies to benefit from set-aside and sole-source contracts that

Clark and Enola were otherwise not permitted to benefit from.[18]

The Government argued that Clark's and Enola's bonding support led to Clark's and

Enola's control of the 8(a) Program contracts.[19]  Because these 8(a) construction contracts

had large subcontracts that Enola paid and because the 8(a) Program contractors badly

negotiated some of the 8(a) Program contracts, Clark or Enola may not have made any

contract profits.  Irrespective, the Government claims that Clark and Enola took enough

control of the 8(a) Program contractor co-defendants to make the relationship fraudulent.[20]

The Government charged that Clark also used this type of scheme to control set-

aside contracts under a similar procurement program—the Department of Veterans' Affairs

("VA") Service-Disabled Veteran Owned Small Businesses ("SDVOSBs") program.[21]

Specifically, the Government says that Clark secretly bonded and secretly partly owned

P&E Construction, a SDVOSB certified company.[22]  The Government alleges that Clark

received revenue and exercised control that would have also disqualified P&E Construction

from the SDVOSB program.[23]

---

[17] Doc. 145 ¶¶ 10-12, 72.
[18] *Id.* ¶ 72.
[19] *Id.*
[20] *Id.*
[21] *Id.*  This program restricts eligibility for certain government contracts to SDVOSBs.  *Id.* ¶ 28.  To be eligible for the SDVOSB program, the veteran-owned business must meet several criteria, including that the veteran must unconditionally own 51 percent of the SDVOSB, and control the management and daily operations of the business.  *Id.* ¶¶ 57-58.
[22] *Id.* ¶¶ 59-71.
[23] *Id.*

Case No. 1:19-cr-148
Gwin, J.

For these schemes, the Government charged Clark and four codefendants in a thirty-

three-count indictment[24]:

| Defendants | Counts | Violations | Description |
|---|---|---|---|
| James Allen Clark<br>Eric Louie Hogan<br>Kevin James Alford<br>Harvey Daniels Jr. | 21 | 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |
| James Allen Clark<br>Eric Louie Hogan<br>Kevin James Alford | 22-23 | 18 U.S.C. § 1343 | Wire Fraud |
| James Allen Clark<br>Eric Louie Hogan<br>Harvey Daniels Jr. | 24-25 | 18 U.S.C. § 1343 | Wire Fraud |
| James Allen Clark<br>Eric Louie Hogan<br>Kevin James Alford | 27 | 18 U.S.C. § 286 | Conspiracy to Submit False Claims |
| James Allen Clark<br>Eric Louie Hogan<br>Kevin James Alford | 28-30 | 18 U.S.C. § 287 | False Claims |
| James Allen Clark<br>Eric Louie Hogan<br>Kevin James Alford | 31-33 | 18 U.S.C. § 1031 | Major Fraud |

Defendant Clark's four codefendants pleaded guilty. Clark went to a jury trial. At

the end of the Government's case, Clark moved for a judgment of acquittal on all counts.

The Court granted Defendant's motion as to honest services wire fraud counts—1 through

20—but denied it as to the remaining counts—21 through 33. Clark then presented his

case, testifying in the process.

The jury convicted Clark on all the submitted counts. Clark now renews his motion

for a judgment of acquittal on counts 21 through 33.

---

[24] Doc. 145.

Case No. 1:19-cr-148
Gwin, J.

## II.      Discussion

### A.  Motion for Acquittal

Clark moves for judgment of acquittal under the Federal Rule of Criminal Procedure 29(c).

Rule 29 requires the court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[25]  In assessing a defendant's motion for acquittal, the court considers the evidence in a light most favorable to the Government and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[26]  "Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt."[27]

The Court addresses Clark's motion as it relates to each count.

### 1.  Sufficient Evidence Supported the Wire Fraud Counts, Including the Conspiracy to Commit Wire Fraud.

Clark argues that there was insufficient evidence for any rational juror to convict him of wire fraud.[28]

To convict Defendant of wire fraud in violation of 18 U.S.C. § 1343, the Government needed proof "(1) that the defendant devised and willfully participated in a scheme to defraud; (2) that he used or caused to be used an interstate wire communication

---

[25] Fed. R. Crim. P. 29(a).
[26] *United States v. Connery*, 867 F.2d 929, 930 (6th Cir. 1989).
[27] *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (internal citation omitted).
[28] Doc. 237-1 at 22-26

Case No. 1:19-cr-148
Gwin, J.

in furtherance of the scheme; and (3) that he intended to deprive the victim of money or property."[29]

Clark challenges only the first element—that he devised and willfully participated in a scheme to defraud.  Specifically, Clark says that his bonding support and teaming agreements did not support wire fraud convictions because Clark's arrangements were disclosed to the relevant government officials or otherwise followed controlling regulations.[30]

Clark's arguments fail.  Construing the evidence in the light most favorable to the Government, the arrangements were *not* in compliance with the relevant regulations. Moreover, Clark and his co-conspirators only partially disclosed his involvement.  And Clark and his co-conspirators made most of these disclosures only after supervising contract officials had already raised concerns about Clark's and Enola's control.

The Court briefly describes evidence supporting each wire fraud count.

### a. Count 22 & 23: Wire Fraud Arising Out of NASA Plum Brook Station Contract

The Government presented evidence that Clark and Eric Hogan concealed Clark's involvement in Hogan's company, P&E Construction, and this concealment helped P&E Construction keep its SDVOSB certification.  Relevant to counts 23 and 23, a reasonable juror could find that Clark and Hogan falsely used P&E's SDVOSB status to receive a set-aside contract at NASA Plum Brook Station.

As a SDVOSB-certified company, Eric Hogan needed to control P&E Construction.

---

[29] *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012) (internal quotations omitted).
[30] Doc. 237-1 at 23-25.

Case No. 1:19-cr-148
Gwin, J.

Before 2012, P&E qualified for SDVOSB contracts.[31]  However, in 2012, a competing company challenged P&E's SDVOSB status.[32]  In challenging P&E Construction's SDVOSB status, that competing company argued that "Clark had too much undue influence on P&E, and, therefore, [P&E] didn't meet the criteria to be a service-disabled vet[eran-owned business]."[33]

In response and in August 2012, the VA investigated P&E's SDVOSB eligibility—focusing on claims that Hogan was unduly dependent on Clark for employment, bonding, and financial support.[34]

These Government construction contracts require contractors to obtain third-party performance bonding.[35]  When underwriting these bonds, insurers require construction company owners to indemnify the bond insurer for any bond claim payments.[36]  Past contract performance and contractor and indemnifier balance sheets control bond availability.[37]

On September 11, 2012, the VA concluded that P&E's reliance on Clark for bonding, and Hogan's employment with Enola, disqualified P&E from the SDVOSB program.[38]

Hogan and Clark tried to regain P&E's SDVOSB certification—by misrepresenting Clark's P&E involvement.  On September 12, 2012, Defendant Clark provided a draft letter

---

[31] Doc. 242 at 171-73.
[32] GX 2029.
[33] Doc. 242 at 189.
[34] *See* GX 2031.
[35] Doc. 207 at 68.
[36] Doc. 213 at 162; Doc. 207 at 72.
[37] *See* Doc. 242 at 99; Doc. 243 at 142.
[38] GX 2033.

Case No. 1:19-cr-148
Gwin, J.

and asked his bond underwriter to send the letter to the VA.[39]  The bond underwriter's

letter to the VA falsely stated that P&E had its own bonding and that P&E Construction's

bonding was independent of Enola's bonding.[40]  On September 13, 2012, Clark told

Hogan that he would transfer Clark's P&E shares back to Hogan "on paper" but would

continue providing Enola-supported bonding through an "off-line" agreement with his

bonding company.[41]

On September 14, 2012, Clark emailed the VA contract specialist and falsely

represented that Clark would be transferring his 49% P&E share to Hogan.[42]

These were false representations.  Despite divesting himself "on paper" of his

controlling interests in P&E, Clark continued to exert control and influence over, and

expect profit from P&E's operations.[43]  Hogan and P&E did not have stand-alone bonding.[44]

Clark continued providing bonding support to P&E Construction.[45]

---

[39] Doc. 242 at 191, 199-201; GX 2034.
[40] GX 2034.
[41] Doc. 242 at 197; GX 2039.
[42] GX 2040.
[43] Doc. 242 at 198 ("Q. What was the profit relationship and the ownership relationship after that, even though [Clark] gave it back to you on paper? A. I still was going to give him 49 percent"); Doc. 242 at 205 ("After that [Clark] still stayed 49 percent"); Doc. 242 at 209 (Clark and Hogan still partners "just like it's always been"); GX 2047 (October 31, 2012, Clark/Hogan email about P&E status with VA); GX 2050 (November 26, 2012, Hogan email to Clark regarding P&E's status in VA registry); GX 2052 (January 4, 2013, Hogan email to Clark – "*We* are back in business!") (emphasis added); GX 2054 (Clark April 11, 2013, email to Hogan: "I am telling [Hartford underwriter] that I had to give you back the stock to get the SDVO[S]B certification renewed due to the VA regs but that you and I are still partners on paper 51/49 . . . just like its [sic] always been"); GX 5009 (March 4, 2013, Clark email to Hogan asking "did we lose all profit at [Robley Rex]?"); GX 5017 (March 18, 2014, Clark email noting he provided bonding on P&E NASA contract, and that Clark approved of P&E bid Alford submitted for the NASA contract); GX 5010; GX 5011; GX 5012; GX 5013; GX 5014 (May-September 2013 Enola contracts, invoices and payments to Labor Finders directing labor and workers on P&E Robley Rex contract); GX 6017 (Clark falsely representing himself as a P&E employee to gain access to NASA facilities in March 2013).
[44] Doc. 242 at 203-04.
[45] *Id.*

Case No. 1:19-cr-148
Gwin, J.

After these misrepresentations, the VA recertified P&E as a SDVOSB.[46]  And, ultimately, P&E obtained the NASA Plum Brook Station contract after recovering the SDVOSB certification.

In summary, Clark participated in a scheme to conceal his significant control of a purportedly SDVOSB-eligible company to obtain potential benefits from a SDVOSB contract P&E Construction would otherwise be ineligible to receive.  Clark's misrepresentations were material and intentional.  The Government offered sufficient evidence for a rational juror to find Clark guilty of counts 22 and 23.

### b.  Count 24: Wire Fraud Arising Out of U.S. Navy Test Track Contract

The Government presented evidence that Clark and two co-conspirators, Jennifer Snider and Kent Reynolds, defrauded the U.S. Navy by concealing Clark's control over Snider and Reynolds's 8(a) company, Arrow Construction.  Relevant to count 24, the Government presented evidence that Clark and his co-conspirators concealed Clark's control level of Arrow Construction at two stages.

### i.  Bonding Support and Teaming Agreement

Clark, Snider, and Reynolds first concealed Clark's bonding and teaming agreement with Arrow.

In 2011, a Naval contracting officer solicited Snider and Arrow to offer an 8(a) Program proposal.[47]  At the time, Arrow had 8(a) certification and had a history of working on a SBA approved mentor-protege basis with Island Mechanical Contractors.[48]  In their

---

[46] Doc. 242 at 208; GX 2052.
[47] Doc. 213 at 249.
[48] *Id.* at 181, 186; Doc. 242 at 24-25.

-10-

Case No. 1:19-cr-148
Gwin, J.

relationship, Island Mechanical supported job bonding that Arrow could not otherwise obtain.[49]

But near the same time the Naval contracting official contacted Arrow about negotiating a test track reconstruction, Arrow and Island Mechanical were in a bad contract dispute related to a different job.[50]  Island Mechanical claimed that Arrow Construction failed to pay a subcontractor and that the unpaid subcontractor had made claims on the bond that Island Mechanical had agreed to indemnify.[51]

Without Island Mechanical's support and with this earlier job default, Arrow Construction had no way to obtain bonding to accept the Navy offer for the Test-Track-Contract.[52]  Arrow Construction needed bonding to receive the Test-Track-Contract.[53]

Snider then first met Clark.  After their meeting, Clark offered to bond Arrow for the test track reconstruction project.[54]  Clark conditioned his bonding support on Arrow signing a teaming agreement with Clark's company, Enola.[55]  The teaming agreement provided that (1) 90% of the proceeds go to Enola with 10% going to Arrow; (2) with this 90% of the proceeds, the teaming agreement required Enola to absorb all project costs and control, including hiring, supervising and paying subcontractors;  (3) Enola would keep project records; and (4) Enola would prepare all "Progress Billings" and submit them to Arrow for Arrow to forward to the Navy .[56]

---

[49] Doc. 213 at 186; Doc. 242 at 25.
[50] Doc. 242 at 11-12, 258-60.
[51] *Id.* at 11-12, 45, 258-60.
[52] Doc. 213 at 190-91.
[53] *Id.* at 361.
[54] *Id.* at 190-91.
[55] *Id.* at 192-93.
[56] GX 3004A.

Case No. 1:19-cr-148
Gwin, J.

Although teaming relationships were allowed, Arrow's Test-Track-Contract required that at least 15% of the job labor be performed by Arrow employees.[57] The 8(a) regulations also require the 8(a) firm to perform 15% of the job labor.[58]

Clark pressured Snider and Reynolds to not disclose the arrangement to the Small Business Administration.[59] With this undisclosed arrangement in place, the Navy awarded Arrow the Test Track project in September 2011.[60]

ii. Arrow's Financial Problems Lead to Clark Taking Further Control

Clark, Snider, and Reynolds next concealed Clark's growing control over Arrow. SBA Section 8(a) program contractors commit to tell the SBA about any control changes.[61] While Clark's and Enola's Arrow Construction control was originally vague, Clark soon took major control of the Test-Track-Contract. Clark specially took control of the project after Clark needed to front payment for earlier Arrow Construction debts.

Likely, Clark agreed to supply bonding and indemnification to Arrow Construction after considering the construction work and the contract price. Clark, however, did not appreciate that Arrow had major debts and issues that exposed Clark to need to make major payments to keep Arrow operating, and more importantly to protect Clark from indemnification claims if Arrow failed. Independent of these criminal charges, Clark's Arrow Construction involvement may have been one of Clark's dumbest business involvements.

There were several reasons that Clark took greater Arrow control.

---

[57] *See* GX 3000.
[58] Doc. 207 at 77.
[59] Doc. 213 at 193.
[60] *See id.* at 203.
[61] Doc. 207 at 83, 86-87, 117.

Case No. 1:19-cr-148
Gwin, J.

First, Snider's brother-in-law stole over $30,000 from Arrow's bank account.[62]  The Navy had reimbursed Test-Track-Contract bonding costs, and Snider's brother-in-law Johnny Dunaway took the money.[63]  Because Arrow, Snider and Reynolds could not cover the bond cost, Clark personally paid the bond cost.[64]

Second, the Test-Track-Contract included significant asphalt and specialized paving. Clark, Snider and Arrow intended that Arrow would subcontract this work.  In giving its Test-Track-Contract proposal, Arrow relied upon an Oxford subcontract paving proposal.[65] But Arrow did not catch that the Navy Contract also required that a large parking lot be paved.[66]  The Oxford paving subcontract proposal did not include the parking lot.[67] Because Test-Track-Contract required Arrow Construction to pave the parking area, Arrow would need to absorb the $200,000 - $300,000 additional paving cost that Snider had  not included in the Arrow bid.[68]

Third, Arrow Construction had defaulted on subcontractor payments on work it had earlier performed with Island Mechanical.[69]  On that earlier job, a subcontractor made a claim against Zurich Insurance Company, the company that had bonded the earlier work.[70] To avoid Zurich levying against Test-Track-Contract revenues, Clark paid roughly $150,000 to pay off claims related to the earlier contract to avoid a levy on the test track government payments.[71]

---

[62] Doc. 213 at 201, 205.
[63] *Id.*
[64] *Id.* at 201-02.
[65] Doc. 243 at 110-12.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.* at 120-23.
[70] *Id.*
[71] *Id.*

-13-

Case No. 1:19-cr-148
Gwin, J.

Fourth, Johnny Dunaway came out of the woodwork and claimed that he owned 49% of Arrow Construction.[72]  As described, Dunaway had earlier removed over $30,000 from Arrow Construction that was supposed to pay the Test-Track-Contract bonding costs.[73]  Dunaway now demanded $75,000 for his claimed 49% share and threatened that he could stop reimbursement to Clark for the monies that Clark had already invested in Arrow.  Clark paid Dunaway $25,000 to stop Dunaway's claim.  Once again, Clark used his own money to pay Dunaway off.[74]

After these changes to Arrow's position and ability to complete the contract, Clark took significantly more control of the Test-Track-Contract execution and financials.  By the time work on the contract began, Arrow Construction "didn't have any employees at that point."[75]  Clark loaned three Enola employees to supervise the subcontractor work on the Test Track contract.[76]  Subcontractors performed the actual demolition and construction work.  Snider was "not very much" in "the loop."[77]  Snider merely did the billing for the job following Clark's instructions.[78]  Mostly, Snider played "catch-up and put out old fires" related to Arrow Construction's earlier mentor-protégé Island Mechanical.[79]

Despite knowledge that the SBA required disclosure of financial positions affecting control of 8(a) contractors, Clark failed to disclose his major Arrow Construction investments to the Navy or to the SBA.

---

[72] Doc. 213 at 211-12.
[73] *Id.* at 201, 205.
[74] Doc. 243 at 122.
[75] Doc. 213 at 207.
[76] *Id.* at 206.
[77] *Id.* at 218.
[78] *Id.* at 219-20.
[79] *Id.* at 207.

Case No. 1:19-cr-148
Gwin, J.

In March 2012, a Navy contracting officer contacted Snider and asked whether Arrow was insolvent.[80]  Arrow's former partner, Island Mechanical, had apparently contacted the Navy contracting officer during a time when Island Mechanical was continuing its dispute with Arrow Construction on their former construction collaboration.[81]

In response to the Navy contracting officer's questions, Clark wrote a letter and gave the letter to Snider.[82]  He then asked Snider to include Clark's letter with Snider's response.[83]  She did.[84]

Snider and Clark's letters to the contracting officer disclosed that Clark had given Arrow project assistance.[85]  However, Clark's letter understated Clark's and Enola's Arrow Construction involvement.[86]

Clark had given a $2.8 million personal guarantee to the bonding company to obtain the Test-Track-Contract bond.[87]  As described, Clark had paid more than $250,000 for Arrow debts that predated his Arrow contact.[88]  Clark shared access to Arrow Construction's bank account and controlled subcontractor supervision and payments.[89]  Clark and Snider did not disclose this to the Navy or the SBA.

---

[80] *Id.* at 222.
[81] *Id.* at 230.
[82] *Id.* at 222-229.
[83] *Id.*
[84] *Id.*
[85] *Id.* at 224.
[86] *Id.* at 222-229.
[87] *Id.* at 191-93; GX 3000.
[88] Doc. 243 at 120-28.
[89] Doc. 213 at 209.

Case No. 1:19-cr-148
Gwin, J.

The Government also gave evidence that Clark enjoyed Arrow equity ownership (even though it was probably worth nothing).[90]  Clark received some Arrow ownership interest when Clark paid $150,000 to clear subcontractor claims from Arrow's collaborative contract working with Island Mechanical.[91]

In summary, Clark joined a scheme to conceal his level of control of an 8(a)-eligible company.  Independent of its illegality, the Arrow Construction involvement seems to have been a terrible investment decision for Clark. Clark's misrepresentations and failure to disclose his control level were material and were made with Clark's intent to deceive.

Sufficient evidence existed for a rational juror to find Clark guilty of count 24.

### c. Counts 25 & 26: Wire Fraud Arising Out of U.S. Navy Craneway Windows Contract

The Government presented evidence that Clark and two codefendants, Eric Hogan and Harvey Daniels, defrauded the U.S. Navy by concealing Clark's bonding for and partial control over Daniels's 8(a) company, HDJ Security.  Relevant to counts 25 and 26, the Government presented evidence that Clark and his codefendants concealed Clark's true HDJ Security involvement to obtain a U.S. Navy sole-source contract for the "Craneway Windows" contract at Marine Corps Logistics Base in Albany, Georgia.

Government Contracting Agent Sam Stringer first reached out to codefendant Eric Hogan to see if Hogan's company, P&E Construction, could do a window replacement job.[92]  Hogan responded that P&E Construction was no longer an 8(a)-certified company.[93]

---

[90] Doc. 243 at 121.
[91] *Id.*
[92] Doc. 242 at 224-25.
[93] *Id.*

-16-

Case No. 1:19-cr-148
Gwin, J.

Stringer then asked Hogan "do you know another 8(a) [that could do the window work]?"[94]

Hogan responded that he would try to find an 8(a) contractor that he could suggest to

Stringer.[95]

Hogan then contacted Clark, and Clark suggested Arrow Construction, but

Government Contracting Official Sam Stringer responded that Arrow could not do the

work.[96]  Clark then suggested HDJ Security, and Hogan sent the HDJ suggestion to

Stringer.[97]  Contracting Official Stringer then approached HDJ Security to negotiate an 8(a)

contract for the window replacement.[98]

The Government contended that Clark exerted excessive control over HDJ

Security's Craneway Windows project.[99]  The Government argues that Clark knew that the

sole-source contract needed HDJ control .[100]  Despite this knowledge, the Government

alleged that Clark, Hogan, and P&E Construction unduly controlled the window

replacement project.[101]

HDJ Security had construction contracts around Florida independent of its work on

the Craneway Windows Contract.[102]  However, HDJ Security was a newer Section 8(a)

program participant.[103]  Daniels knew Clark and Enola had been a successful 8(a)

contractor and sought Clark's guidance about the Program.[104]

---

[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] Doc. 145 ¶¶ 81-88.
[100] *Id.*
[101] *Id.*
[102] Doc. 242 at 82-83.
[103] *Id.* at 66-67.
[104] *Id.* at 68-69.

Case No. 1:19-cr-148
Gwin, J.

After learning about the contract from Clark and Hogan, HDJ Security received the

$1.3 million contract for the replacement of Craneways Windows at Marine Corps Logistics

Base Albany, Georgia.[105]

To accept the contract, HDJ Security needed payment and performance bonding.[106]

At the time HDJ received the Craneway Windows Contract, HDJ Security "did have the

ability to receive bonding, but that size of contract may have been difficult."[107]

To help with the needed bonding, Harvey Daniels approached Defendant Clark and

asked for Clark's help.[108]  Clark agreed to provide the bonding help if Harvey Daniels

would agree to a teaming relationship with Clark and with Enola Contracting.[109]  Daniels

agreed.[110]

Although teaming relationships were allowed, HDJ Security's Craneway Windows

contract required that at least 15% of the job labor be performed by HDJ Security

employees.[111]  The 8(a) regulations also require the 8(a) firm to perform 15% of the job

labor.[112]

The Government's evidence shows that a reasonable juror could find that Clark and

his codefendants fraudulently concealed the extent of Clark's Craneway Windows Contract

involvement.

Although HDJ Security had some bonding ability, Clark and Enola had more.  In

negotiating Clark's bonding assistance, Clark (falsely) told Daniels that Clark's bonding

---

[105] *Id.* at 68-69, 224-25.
[106] *Id.* at 68-69.
[107] *Id.*
[108] *Id.*
[109] *Id.* at 69-71.
[110] *Id.*
[111] *Id.*
[112] Doc. 207 at 77.

Case No. 1:19-cr-148
Gwin, J.

company required that Enola and HDJ enter a teaming agreement for the Craneway

Windows project.[113]  Clark's and HDJ's teaming agreement gave Clark and Enola major

revenue and contract completion responsibilities.[114]

> Daniels explained why he agreed to the 95% - 5% revenue split:
>
> I was new in the 8(a) program, and my experience with acquiring contracts, with contracting officers, they typically do not give a contract to someone they have not worked with before or know someone that is working with them.  So I wanted to get my foot in the door on this installation. . . .  So I decided to take a project where I make no money so that I can build a reputation with the contracting officers in the installation.[115]

With his share of the revenues, Daniels absorbed the cost of the inspector, the job

superintendent, the quality control employee, and all of the office work associated with the

Craneway Windows Contract.[116]  Clark and Enola Construction may have paid some of

these employee expenses.[117]

> Clark and Enola agreed to pay subcontractor expenses.[118]

> Clark and Enola did not work on the window replacement contract.  Instead, and

after entering the revenue split agreement, Clark then subcontracted with Hogan's

company, P&E, to provide labor and materials and perform the construction work required

Craneway Windows Contract.[119]

> During performance of the contract, Clark sought to inflate HDJ's project

involvement because, under the government contract and the regulations, HDJ was

---

[113] Doc. 242 at 71.  Doc. 213 at 122-23, 138-39.
[114] GX 4011.
[115] Doc. 242 at 72.
[116] *Id.* at 74-78.
[117] *See* GX 4026 (Clark email to Daniels saying "a payment plan needs to be worked out before [Toole] does any more work" for HDJ); GX 4047 (Clark email to Daniels that he will sue Daniels to recover Toole's salary); GX 4048 (Clark's documentation of Toole's HDJ salary paid for by Enola).
[118] GX 4010.
[119] *Id.*

Case No. 1:19-cr-148
Gwin, J.

supposed to perform 15% of the labor.[120]  To meet this quota, the codefendants used a

scheme with Enola's employees and Hogan's P&E employees representing themselves as

HDJ employees.[121]

These employees generally remained employed by either Enola or P&E Construction

although they received some HDJ Security compensation.[122]  Eric Hogan's P&E

Construction performed almost all the Craneway Windows Contract work under a sub-

contract with Enola and Clark.[123]

Clark also concealed the nature of his own involvement in the project.  He advised

codefendant Hogan to conceal from the Navy's contracting officer that "HDJ will

sub[contract] 95 percent of the total contract to Enola to put up the bond, and Enola will

sub that to P&E onsite to do the job."[124]

In sum, Eric Hogan and P&E Construction led a scheme to overstate HDJ Security's

Craneway Windows Replacement Contract participation.  Clark joined in the scheme by

providing bonding support and providing employee support for the job.  Especially Hogan,

but also Clark assisted HDJ Security and Daniels obtain benefits from an 8(a) contract that

---

[120] GX 4008; Doc. 207 at 77.
[121] GX 4006 (Clark email to Toole, both using Enola contracting email accounts, asking Toole to set up an HDJ email account for Hogan); GX 4006 (Hogan email to Clark and Toole, both using Enola contracting email accounts, discussing having Daniels claim Hogan as an HDJ employee); Doc. 242 at 230 ("Q: why didn't you send [a request] to Mr. Daniels? [Hogan] A: Because I'd always worked through Allen.  My contract was with Allen, so I waited on him to tell me what to do."); Doc. 242 at 78-82, 85 (Daniels testimony that he came to know Hogan and Toole because they both worked for Clark, that he did not pay Hogan as an employee, and that he did not control Hogan's day-to-day activities); Doc. 242 at 58-59 (Brewer testimony that he "considered myself working for Eric Hogan and P&E," not HDJ on the Craneway project); GX 4012 and Doc. 242 at 232-33) (Hogan email to Daniels stating "I will use one of my folks," Ronnie Gomillion, to serve as the HDJ safety officer and testimony that "[Gomillion] worked for Enola, and Enola gave him to HDJ to work as safety on [the Craneway contract]" and "I told [Daniels] that [Brewer] would be his superintendent and then, I think, Ronnie Gomillion came from Allen.").
[122] Doc. 242 at 74-78.
[123] GX 4010.
[124] Doc. 242 at 227.

Case No. 1:19-cr-148
Gwin, J.

they were otherwise ineligible to receive. There is sufficient evidence for a rational juror to

find Clark guilty of counts 25 and 26.

### d.  Count 21: Conspiracy to Commit Wire Fraud

Defendant Clark argues that the evidence to support his conviction on the

conspiracy to commit wire fraud was insufficient.  The elements of this offense are that (1)

two or more people conspired or agreed to commit wire fraud, and (2) Defendant

knowingly and voluntarily joined the conspiracy.[125]

Because the alleged conspiracy involves much what has covered in the preceding

sections with respect to the substantive wire fraud counts, that discussion applies here as

well.  The evidence was sufficient to allow the jury to find Clark guilty on count 21.

### 2.  Insufficient Evidence Supported the False Claims Counts, Including the Conspiracy to Submit False Claims.

Clark argues that there was insufficient evidence for any rational juror to convict

him of submitting or conspiring to submit false claims.

### a.  Counts 28-30: False Claims Arising Out of NASA Plum Brook Station Contract

In order to convict Defendant of submitting false claims in violation

of 18 U.S.C. § 287, the Government needed to prove that (a) Defendant presented a false

claim against the United States; (b) that the claim was based upon a false material fact; and

(c) that the Defendant knew that the claim was false.[126]

---

[125] *See United States v. Rogers*, 769 F.3d 372, 379-80 (6th Cir.  2014).
[126] 18 U.S.C. § 287; *United States v. Cox*, No. 14-CR-00085-JMH, 2016 WL 69895, at *1 (E.D. Ky. Jan. 5, 2016).

Case No. 1:19-cr-148
Gwin, J.

Clark argues that "[t]he Government failed to establish any false, fictious [sic], or fraudulent claim."[127]  He says that neither Clark nor his codefendants made any affirmative false statements, false statements by omission, or implied false statements in the invoices submitted to NASA that underlie the false claims counts.  [128]  Clark specifically argues that "the NASA contract doesn't contain any express provision that by submitting invoices for payment Hogan certified that P&E was an eligible SDVOSB."[129]

Relatedly, Clark argues that Hogan, not Clark, ran P&E Construction.

The issue is close because of the materiality requirement.

The United States does not identify any specific Clark statement to NASA regarding the Plum Brook Station work.  Instead, the Government seems to argue that the invoice submission incorporates a representation that all government regulations have been complied with.[130]

The Plum Brook Station contract invoices contain a "Contractor's Certification."[131]  With this provision, the submitting government contractor certifies that the invoices "are only for performance in accordance with the specifications, terms, and conditions of the [contract]."[132]  The contract, in turn, required SDVOSB certification.[133]

Clark, himself, never himself submitted the invoices.  Instead, Hogan submitted the invoices.[134]  Hogan owned majority control of P&E Construction but Clark gave bonding support for the NASA Plum Brook Station contract.  The Government makes the argument

---

[127] Doc. 237-1 at 27 (capitalization altered).
[128] *Id.* at 28-29.
[129] *Id.* at 28 n. 13 (citing GX 6001).
[130] Doc. 247 at 51-55.
[131] GX 6133 at 5; GX 6136 at 1; GX 6139 at 1.
[132] GX 6133 at 5; GX 6136 at 1; GX 6139 at 1.
[133] GX 6001 at 1-2, 41.
[134] *See* GX 6133, 6136, 6139.

-22-

Case No. 1:19-cr-148
Gwin, J.

that bonding support and an amorphic retained equity interest gave Clark SDVOSB

disqualifying control over P&E Construction.

From these arguments, the Government then jumps to the argument that Hogan's

claim submission was improper and that Clark encouraged Hogan's submission. Finally,

the Government jumps to the conclusion that Clark is guilty when Hogan and P&E

Construction sent the NASA contract invoice.

According to the Government, Clark is guilty because he knew Hogan was

submitting the invoices and Clark should have known that Hogan would not qualify for the

SDVOSB program if Clark's bonding support and minority ownership interest had been

known.

To sustain a false claim conviction, the representation or omission must be material.

"The materiality standard is demanding. The False Claims Act is not `an all-purpose

antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or

regulatory violations."[135] Similarly, a "misrepresentation cannot be deemed material

merely because the Government designates compliance with a particular statutory,

regulatory, or contractual requirement as a condition of payment."[136] "Materiality, in

addition, cannot be found where noncompliance is minor or insubstantial."[137] "[W]hen

evaluating materiality under the False Claims Act, the Government's decision to expressly

identify a provision as a condition of payment is relevant, but not automatically

dispositive."[138]

---

[135] *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2003-04 (2016).
[136] *Id.*
[137] *Id.* at 1995.
[138] *Id.*

Case No. 1:19-cr-148
Gwin, J.

In *Escobar*, the Supreme Court limited the FCA "implied false certification" theory, holding that a defendant may be liable under that theory only when it "submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement."[139]

Under *Escobar*, materiality is not judged in a vacuum. Rather, materiality depends on the context of the relevant decision impacted by the alleged false statement - "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."[140] The materiality standard is rigorous.[141]

Restating, the Government argues that Hogan needed to voluntarily disclose Clark's retained P&E Construction ownership interest and argues that Clark is criminally liable because Hogan did not make the disclosure. The Government does not contend that Hogan made any affirmative misrepresentation about Clark's interest when he bid on the NASA contract; only that he did not disclose Clark's interest. The Government does not contend that Clark made any misrepresentations regarding the NASA contract, only that Clark failed to disclose Clark's somewhat unclear continued equity interest in P&E Construction.

This evidence was insufficient to establish the materiality of Clark or Hogan's omission.

---

[139] *Id.* at 1996.
[140] *Id.* at 2002 (internal quotation marks omitted).
[141] *Id.* at 2004.

Case No. 1:19-cr-148
Gwin, J.

To be sure, two years before the NASA contract, Eric Hogan's SDVOSB certification was taken away after a competing contractor filed a complaint.  Hogan and Clark responded and falsely represented that Clark had given up his P&E Construction equity interest.  Instead, Clark kept some unspecific equity interest.  And kept some control input.

But 8(a) Program companies are allowed to have some outside bonding support and minority ownership.  Therefore, even if Clark and Hogan disclosed Clark's involvement, NASA may still have paid P&E on the invoices.

In sum, there is insufficient evidence for a rational juror to find Clark guilty of counts 28, 29, and 30.

### b.  Counts 27: Conspiracy to Submit False Claims, 18 U.S.C. § 286

Defendant argues that the evidence to support his conviction on the conspiracy to submit false claims was insufficient.[142]

The elements of this offense are that:

(1) the defendant entered into a conspiracy to obtain payment or allowance of a claim against a department or agency of the United States; (2) the claim was false, fictitious, or fraudulent; (3) the defendant knew or was deliberately ignorant of the claim's falsity, fictitiousness, or fraudulence; (4) the defendant knew of the conspiracy and intended to join it; and (5) the defendant voluntarily participated in the conspiracy.[143]

Because the conspiracy alleged in the superseding indictment involved the Clark-Hogan activity described above, much of what the Court said in the preceding section with respect to the substantive false claims counts applies here as well.  The evidence was insufficient to allow the jury to find Clark guilty on count 27.

---

[142] Doc. 237-1 at 22, 25.
[143] *United States v. Dedman*, 527 F.3d 577, 593-94 (6th Cir. 2008).

Case No. 1:19-cr-148
Gwin, J.

### 3.  Sufficient Evidence Supported the Major Fraud Counts.

Clark argues that there was insufficient evidence for any rational juror to convict

him of the major fraud claims.[144]  He says that these counts cannot stand for the same

reasons that the wire fraud counts cannot stand.[145]

Considering that the Court has concluded that the wire fraud convictions related to

the NASA contract can stand, the Court summarily rejects this this challenge.

### B.  Motion for a New Trial

In the alternative, Clark moves for a new trial under Federal Rule of Criminal

Procedure 33.[146]

Rule 33 provides that a court may "vacate any judgment and grant a new trial if the

interest of justice so requires."[147]  "The paradigmatic use of a Rule 33 motion is to seek a

new trial on the ground that the verdict was against the manifest weight of the

evidence."[148]  Under this motion, the district judge may act as a "thirteenth juror,"

assessing the credibility of witnesses and the weight of the evidence.[149]  "Generally, such

motions are granted only in the extraordinary circumstance where the evidence

preponderates heavily against the verdict."[150]

---

[144] Doc. 237-1 at 30-31.
[145] *Id.*
[146] Doc. 237-1 at 31-37.
[147] Fed. R. Crim. P. 33(a).
[148] *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (international citation omitted).
[149] *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).
[150] *United States v. Graham*, 125 Fed. Appx. 624, 628 (6th Cir. 2005).

Case No. 1:19-cr-148
Gwin, J.

Acting in the interest of justice under Rule 33 also "allows the grant of a new trial where substantial legal error has occurred."[151]  However, a defendant in a criminal case "bears the burden of proving that a new trial should be granted."[152]

Clark asserts two arguments under Rule 33.  First, he says that the jury's verdict was against the manifest weight of the evidence for the reasons he identified in his Rule 29 argument.[153]

The Court rejects Clark's first argument as to the charges sustained above.  There was enough evidence to support the jury's verdict as to those charges.

Second, Clark argues that the Court should grant a new trial due to a substantial legal error.[154]  Specifically, Clark says that the Court erred by allowing Clark's co-conspirators to testify that they pleaded guilty to the same crimes with which Clark was charged.[155]

Clark correctly argues that the Court erred in allowing the Government to ask cooperating witnesses whether they had already pled guilty to conspiring with Clark.

This plea agreement issue arose before trial when Clark moved *in limine* to exclude evidence of the guilty pleas.[156]  In support of the motion, Clark represented that he would not use the co-conspirators' plea agreements to challenge the co-conspirators' credibility.[157]  He acknowledged that "a plea agreement of a testifying alleged co-conspirator may [otherwise] be admissible when the co-conspirator's credibility is at issue[,] [b]ut where the

---

[151] *Munoz*, 605 F.3d at 373.
[152] *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994); *accord United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991).
[153] Doc. 237-1 at 32.
[154] *Id.*
[155] *Id.*
[156] Doc. 177.
[157] Doc. 177-1 at 1.

Case No. 1:19-cr-148
Gwin, J.

defense does not intend to challenge the witness's credibility based on his plea agreement, the relevance of the plea agreement disappears."[158]

In opposing Clark's motion *in limine*, the Government argued that it could solicit co-conspirator plea agreements evidence because "the government is allowed to have a jury consider and assess the credibility of its witnesses at trial" and that any prejudice could be cured by jury instructions and a "timely admonishment by the court."[159]

The Court sided with the Government and denied Clark's motion *in limine*. Upon reconsideration of this issue with the instant motion, the Court finds that it erred in allowing the Government to elicit testimony about the co-conspirator guilty pleas.

Whether a co-conspirator's guilty plea is admissible turns on the purpose for which it is offered.[160] Evidence of a co-conspirator's plea cannot be offered to prove a defendant's guilt.[161] However, with an appropriate limiting instruction, a co-conspirator's guilty plea may sometimes be considered as evidence relevant to a witness's credibility.[162]

Most typically, where a defendant has not given up the right to challenge the collaborator's testimony as influenced by the plea agreement, the plea agreement is relevant. In using a plea agreement with a cooperation provision, defendants logically cross examine about the plea agreement to suggest that the plea agreement biases the witness's testimony to curry favor the prosecution.

---

[158] *Id.*
[159] Doc. 197.
[160] *See United States v. Walker,* 871 F.2d 1298, 1303 (6th Cir. 1989).
[161] *United States v. Sanders,* 95 F.3d 449, 454 (6th Cir. 1996) (citing *United States v. Blandford,* 33 F.3d 685, 709 (6th Cir. 1994)).
[162] *Id.*

Case No. 1:19-cr-148
Gwin, J.

In trials where defendants do not commit to give up attacking the witness's testimony with the cooperating plea agreement, there is also logic to allow prosecutors to introduce the plea agreement in the prosecutor's direct examination.

CANDOR WITH JUDGES AND JURORS IS CRUCIAL TO ATTORNEY PRESENTATIONS.  With knowledge that the defense cross examination has not forsworn attacking the witness's credibility with the plea agreement, prosecutors can logically initiate questions on the plea agreement in an effort to appear candid with the jury.

The question here is whether a co-conspirator's guilty plea is admissible on credibility grounds when the defendant commits to give up a cooperator plea agreement credibility challenge.

The parties cite no in-circuit case directly answering this question, and the Court knows of none.  The Government seems to take the position that evidence of a testifying co-conspirator's guilty plea is always admissible so that a jury may assess the witness's credibility—even if a defendant promises to forego a plea-based attack.

The Court declines to adopt such an extreme position.  There are, of course, instances in which evidence of a witness's guilty plea should be admitted to help the jury in assessing credibility.  As described, the Government may elicit testimony regarding a witness's plea agreement during direct examination "to deflect defendant's use of a plea agreement to *attack* the witness' credibility,"[163]  or "to anticipate cross-examination by the defendant which might give the jury the unjustified impression that the Government was concealing this relevant fact."[164]

---

[163] *United States v. Tocco*, 200 F.3d 401, 416-17 (6th Cir. 2000).
[164] *United States v. Townsend*, 796 F.2d 158, 162 (6th Cir. 1986) (quoting *United States v. Edwards*, 631 F.2d 1049, 1052 (2d Cir. 1980)).

Case No. 1:19-cr-148
Gwin, J.

In opposing Clark's motion *in limine*, the Government offers an argument that, upon further consideration, seems illogical.  In effect, the Government argues that a felony plea or conviction could make a witness more credible.[165]  But Evidence Rule 609 suggests the opposite.  Felony conviction questions are permitted "to <u>attack</u> []a witness's character for truthfulness by evidence of a criminal conviction."[166]  Rule 609 does not provide for supporting a witness's character for truthfulness with criminal conviction evidence.

By way of explanation, the Court wrongly allowed the Government to ask about co-conspirator plea agreements because the Court incorrectly assumed that those co-conspirators would independently testify about explicit planning conversations with Clark. The Court wrongly thought co-conspirator testimony admitting a conspiracy would have little impact because those co-conspirators would otherwise testify regarding specific discussions with Clark about the conspiracy.

As this trial played out with only vague circumstantial evidence of collaboration, the conspiracy claims were much weaker than this Court wrongly expected.

When a defendant offers to forgo a guilty-plea-based attack on a witness's credibility, the Court should not allow evidence of the witness's plea.  In these circumstances, allowing plea agreement evidence risks that the jury accept the co-conspirator's pleas as evidence of a conspiracy.  In effect, the jury could logically conclude that a conspiracy must have existed if the co-defendants had already admitted a conspiracy existed.

---

[165] Doc. 197 at 2.
[166] Fed. R. Evid. 609 (emphasis added).

Case No. 1:19-cr-148
Gwin, J.

The instant case charges Defendant with, *inter alia*, conspiring with his co-defendants to defraud the government.  The conspiracy charges required the Government to prove concerted effort.  Accordingly, when the Court allowed the co-conspirators to testify that they pleaded guilty to joining a conspiracy with Clark, the risk of prejudice to Clark was especially high.

To be sure, the Court issued a limiting instruction as part of the final jury instructions,[167] but the Court did not contemporaneously admonish the jurors that co-conspirators' guilty pleas were not evidence of the Defendant's guilt—thereby increasing the risk that the jury would consider the pleas for an improper purpose.

In sum, the Court erred in allowing the Government to elicit testimony about the co-co-conspirators' guilty pleas.

Nonetheless, the Court concludes that the error was not significant to the degree necessary to warrant a new trial.[168]  As the Court explained above, there was enough evidence to support the jury's verdict as the charges sustained above, notwithstanding the legal error.

Therefore, in the interest of justice, the Court **DENIES** Defendant Clark's motion for a new trial.

### III.    Conclusion

For these reasons, the Court **GRANTS** Clark's motion for a judgment of acquittal regarding Counts 27, 28, 29, and 30.  The Court **DENIES** Clark's motion for a judgment of acquittal on all other counts and **DENIES** Clark's motion for a new trial.

---

[167] Doc. 244 at 35.
[168] *Munoz*, 605 F.3d at 373.

Case No. 1:19-cr-148
Gwin, J.

IT IS SO ORDERED.

Dated: February 20, 2020            _s/_____*James S. Gwin*_____
                                   JAMES S. GWIN
                                   UNITED STATES DISTRICT JUDGE